



FILED

Jun 20 2018, 11:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 18S-EX-334

## NIPSCO Industrial Group
*Appellant (Intervenor),*

–v–

## Northern Indiana Public Service Company
*Appellee (Petitioner).*

---

Argued: November 21, 2017 | Decided: June 20, 2018

Appeal from the Indiana Utility Regulatory Commission
No. 44403-TDSIC-4
On Petition to Transfer from the Indiana Court of Appeals
No. 93A02-1607-EX-1644

---

**Opinion by Justice Slaughter**

Chief Justice Rush and Justices David, Massa, and Goff concur

**Slaughter, Justice.**

Under traditional rate regulation, an energy utility must first make improvements to its infrastructure before it can recover their cost through regulator-approved rate increases to customers. The process for recouping these costs, sometimes not until years after they were incurred, is an expensive, onerous ratemaking case, which involves a comprehensive review of the utility's entire business operations.

In 2013 the legislature authorized utilities to obtain regulatory **preapproval** for "designated" improvements to their infrastructure. Under the so-called "TDSIC" Statute—which provides for more prompt reimbursement of specified transmission, distribution and storage system improvements—a utility can seek regulatory approval of a seven-year plan that designates eligible improvements, followed by periodic petitions to adjust rates automatically as approved investments are completed.

At issue here is the Indiana Utility Regulatory Commission's preapproval of approximately $20 million in infrastructure investments for which the Commission authorized increases to NIPSCO's natural-gas rates under the TDSIC mechanism. NIPSCO is an energy utility with more than 800,000 customers in northern Indiana. Some of NIPSCO's largest industrial customers—represented here by the NIPSCO Industrial Group—oppose NIPSCO's entitlement to favorable rate treatment under the TDSIC Statute, contending the disputed projects do not comply with the Statute's requirements.

The Commission's holding below, which divided our Court of Appeals, approved various **categories** of improvements—referred to variously as "project categories", "multiple-unit-project categories", and "multiple-unit projects"—that describe broad parameters for identifying future improvements but do not designate those improvements with specificity. NIPSCO defends these categorical designations by arguing it does not, and cannot, know in advance which specific segments of natural-gas pipes throughout its system will fail each year. But it does know, based on historical performance, that a certain percentage of its system will need to be replaced annually. NIPSCO contends the TDSIC Statute permits the Commission to approve a seven-year plan that describes future

investments in terms of ascertainable planning criteria, although when its plan was approved, NIPSCO did not know which specific segments of its system would need to be replaced.

The Industrial Group, in contrast, interprets the TDSIC Statute more narrowly. It argues the Statute requires the utility and the Commission to designate specific projects upfront, rather than to rely on categories of projects not identified with specificity until later years. For the Industrial Group, the traditional ratemaking case is still the primary process for seeking reimbursement, subject to occasional use of the TDSIC procedure in the limited band of investments to which it applies.

The stakes are much larger than just the roughly $20 million at issue between NIPSCO and the Industrial Group. The Commission, we are told, has approved billions of dollars of utility-infrastructure investments through the TDSIC process. Given the favorable regulatory treatment, utilities are likely to funnel increasing amounts of infrastructure investments through this reimbursement mechanism. How we resolve these competing visions of the TDSIC Statute will likely have enormous financial consequences for utilities and their customers.

We conclude the TDSIC Statute permits periodic rate increases only for specific projects a utility designates, and the Commission approves, in the threshold proceeding and not for multiple-unit projects using ascertainable planning criteria. In other words, a utility must specifically identify the projects or improvements at the outset in its seven-year plan and not in later proceedings involving periodic updates. There is an appreciable difference between designating specific "projects" and "improvements" up front, which the Statute requires, and describing the criteria for selecting them later, which the Commission approved. We agree with the Court of Appeals' dissenting opinion that Commission approval of "broad categories of unspecified projects defeats the purpose of having a 'plan'." *NIPSCO Indus. Grp. v. N. Ind. Pub. Serv. Co.*, 78 N.E.3d 730, 740 (Ind. Ct. App. 2017) (Barnes, J., dissenting).

Because we find that preclusion principles do not bar our consideration of this important legal issue of first impression, we grant transfer, reverse the Commission's order in part, and remand.

# Factual and Procedural History

## A. Traditional utility regulation

Utility regulation is premised on a "regulatory compact" in which the State sanctions a utility's monopoly within a defined service area and subjects the utility to various regulatory restrictions and responsibilities.

> As a quid pro quo for being granted a monopoly in a geographical area for the provision of a particular good or service, the utility is subject to regulation by the state to ensure that it is prudently investing its revenues in order to provide the best and most efficient service possible to the consumer.

*United States Gypsum, Inc. v. Ind. Gas Co.*, 735 N.E.2d 790, 797 (Ind. 2000) (quotation and citations omitted).

The State regulates utilities through the Commission, which is authorized by statute to act with "technical expertise to administer the regulatory scheme designed by the legislature … to insure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana." *N. Ind. Pub. Serv. Co. v. United States Steel Corp.*, 907 N.E.2d 1012, 1015 (Ind. 2009) (citation omitted). See Ind. Code §§ 8-1-1-1 to 8-1-1-15. When exercising this authority, the Commission balances the public's need for adequate, efficient, and reasonable service with the public utility's need for sufficient revenue to meet the cost of furnishing service and to earn a reasonable profit. *United States Gypsum*, 735 N.E.2d at 797-98. "Proper rates are those which produce a fair and nonconfiscatory return, and such as will enable the company, under efficient management, to maintain its utility property and service to the public, and provide a reasonable return upon the fair value of its used and useful property." *Pub. Serv. Comm'n of Ind. v. Ind. Bell Tel. Co.*, 235 Ind. 1, 15, 130 N.E.2d 467, 473 (1955) (citations omitted).

Traditionally, utility rates are adjusted through general ratemaking cases. General ratemaking is a "comprehensive" process, requiring the

Commission to "examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data [the Commission] has received are representative of operating conditions that will, or should, prevail in future years." *United States Gypsum*, 735 N.E.2d at 798 (citation omitted).

## B. The TDSIC process

Over the years, the legislature has supplemented traditional ratemaking with various "tracker" procedures that allow utilities to ask the Commission to adjust their rates to reflect various costs without having to undergo a full ratemaking case. The TDSIC Statute, I.C. ch. 8-1-39, enacted in 2013, is one such procedure. It encourages energy utilities to replace their aging infrastructure by modernizing electric or gas transmission, distribution, and storage projects. This TDSIC procedure, pronounced "tee-DEE-zick", is a process for utilities to assess a distinct charge—a Transmission, Distribution, and Storage System Improvement Charge—for completed projects deemed eligible improvements under the Statute. In contrast to traditional ratemaking, the TDSIC procedure permits a utility to seek preapproval of designated capital improvements to the utility's infrastructure and then to recover the costs of those improvements every few months as they are completed. Eligible improvements are certain new or replacement utility projects that:

> (1) a public utility undertakes for purposes of safety, reliability, system modernization, or economic development . . . ; (2) were not included in the public utility's rate base in its most recent general rate case; and (3) [were] designated in the public utility's seven (7) year plan and approved by the commission under section 10 of this chapter as eligible for TDSIC treatment".

I.C. § 8-1-39-2.

The TDSIC Statute contemplates two distinct types of proceedings. First, under Section 10, the utility may seek regulatory approval of a

seven-year plan for designated improvements to transmission, distribution, and storage systems. See *Id.* § 8-1-39-10. The Commission shall then approve the plan and designate the planned improvements as eligible for TDSIC treatment if it finds the plan is reasonable. *Id.* § 8-1-39-10(b). When determining that a plan is reasonable, the Commission's order must include (1) "[a] finding of the best estimate of the cost of the eligible improvements", (2) "[a] determination whether public convenience and necessity require or will require the eligible improvements", and (3) "[a] determination whether the estimated costs of the eligible improvements … are justified by the incremental benefits attributable to the plan". *Id.*

Second, under Section 9, once the Commission has approved a seven-year plan, the utility may petition every few months for periodic rate adjustments to recover "eighty percent (80%) of approved capital expenditures and TDSIC costs" for the system improvements designated as eligible and actually completed. *Id.* §§ 8-1-39-9(a), (c), (e). The remaining twenty percent can be recovered only "as part of the next general rate case that the public utility files with the commission." *Id.* § 8-1-39-9(b). The utility must "update [its] seven (7) year plan under subdivision (2) with each petition [it] files under this section." *Id.* § 8-1-39-9(a). Before a utility may recover additional costs above approved estimates, it must specifically justify the additional costs, and the Commission must specifically approve them. *Id.* § 8-1-39-9(f).

## C. NIPSCO's TDSIC litigation

### 1. Designated vs. described

The parties dispute what qualifies as an eligible project under Section 2, which requires both designation and approval of the project in a seven-year plan the Commission approves under Section 10. I.C. § 8-1-39-2(3)(A). The Industrial Group claims the Commission can designate and approve projects identified only during the initial Section 10 process, and not during subsequent Section 9 petitions. It also claims that the TDSIC process is an extraordinary mechanism, applicable only in limited

circumstances, and that the general ratemaking case remains the presumptive process for utilities to recover their investment costs.

NIPSCO, in contrast, argues the Commission can properly designate and approve **multiple-unit projects**, described using ascertainable planning criteria, as TDSIC-eligible. NIPSCO characterizes these multiple-unit projects, generally, as planned undertakings that include component parts that need to be improved, but without knowing in advance which specific parts will require replacement. Here, the United States Department of Transportation mandates that NIPSCO annually inspect thousands of units of natural-gas pipelines throughout its system. NIPSCO does not know in advance which specific pipeline segments within its system it will need to update. But based on historical performance, NIPSCO expects a certain percentage of its system will fail each year and require replacement. Depending on the inspection results, NIPSCO then develops a schedule to replace worn assets. This information enables NIPSCO to identify the specific units of work completed within the multiple-unit projects for which it received Commission approval.

## 2. Current procedural posture

Shortly after the TDSIC Statute was enacted, NIPSCO filed two Section 10 petitions, seeking approval of separate, but substantially similar, seven-year plans: one each for its electric system and its gas system. The Commission approved NIPSCO's Electric Plan in February 2014 and, in a separate proceeding, approved its Gas Plan in April 2014. The plans identified specific projects for the first year and described "project categories" for years two through seven. NIPSCO subsequently filed periodic Section 9 tracker petitions, seeking rate increases associated with completed matters referenced in the approved seven-year plans.

In 2015, the Court of Appeals reversed in part the Commission's order approving NIPSCO's Electric Plan. *NIPSCO Indus. Grp. v. N. Ind. Pub. Serv. Co.*, 31 N.E.3d 1 (Ind. Ct. App. 2015). The Electric Plan lacked sufficient detail for the Commission to determine whether the plan was reasonable and whether it included a best estimate of the cost of improvements under

Section 10. *Id.* at 8. By identifying only the first year of improvements, the Plan presumed that future proposed projects identified in subsequent Section 9 "update" proceedings would be eligible for TDSIC treatment. *Id.* at 8-9. Thus, the Court held, the Plan unlawfully relieved NIPSCO of its burden to show the proposed projects were TDSIC-eligible. *Id.* at 9.

When the Electric Plan appeal was decided, NIPSCO had already completed its first Gas Plan Section 9 tracker petition, TDSIC-1, and the second, TDSIC-2, was pending. Given the legal problems with its Electric Plan, NIPSCO voluntarily dismissed its TDSIC-2 Gas Plan petition with the understanding that its next Section 9 tracker petition, TDSIC-3, would seek TDSIC-2 reimbursement and modification of its Gas Plan to comply with the appellate ruling.

In TDSIC-3, NIPSCO again sought approval of an "updated" seven-year Gas Plan. Although NIPSCO provided additional information for the proposed projects for all seven years of its revised seven-year Gas Plan, its TDSIC-3 petition continued to include projects identified with specificity as well as yet-to-be-identified projects. NIPSCO said it would identify specific instances of completed improvements within certain project-group categories in subsequent Section 9 plan updates. The Commission found that TDSIC-3 presented "a unique situation" because it had already approved NIPSCO's initial Section 10 Gas Plan in a final order. And it generally endorsed NIPSCO's proposal to establish objective ascertainable criteria for selecting specific projects within "project group" categories. The Industrial Group did not challenge the Commission's TDSIC-3 order approving NIPSCO's petition.

In February 2016, NIPSCO filed its fourth Section 9 petition—TDSIC-4—the subject of this appeal. This filing included another update to the Gas Plan, seeking an increase of approximately $20 million in the previously approved "Inspect & Mitigate" category. This category included both additional distinct projects and an increased number of projects within previously approved categories. NIPSCO referred to these Inspect & Mitigate project groups as "multiple-unit projects".

The Industrial Group intervened at the Commission and opposed this petition for $20 million in rate relief. Particularly, the Industrial Group

objected to NIPSCO's multiple-unit-projects approach, arguing that project groups described using objective ascertainable-standard criteria are not permitted under the TDSIC Statute. Despite this challenge, the Commission approved NIPSCO's TDSIC-4 petition. Relying on its TDSIC-3 order, the Commission found NIPSCO's multiple-unit-project categories were supported by sufficient ascertainable planning criteria for later identifying eligible improvements, and the roughly $20 million increase was based on "further identification of the specific projects or asset replacements within the approved project groups."

The Industrial Group appealed the Commission's TDSIC-4 order, and a divided Court of Appeals affirmed. The majority held that NIPSCO's updated seven-year plan was lawful "because the improvements included in the update were not new projects as they were chosen by utilizing the ascertainable planning criteria previously approved by the Commission and contained in NIPSCO's 7-year plan." 78 N.E.3d at 739. The dissent believed the TDSIC Statute requires that a "specific plan" be established in the initial Section 10 proceedings, and that merely describing multiple-unit-project categories does not sufficiently designate which specific projects are eligible for reimbursement through later Section 9 proceedings. *Id*. at 740.

# Standard of Review

When reviewing Commission decisions, we conduct three levels of review: one for factual findings; another for mixed questions of law and fact; and a third for questions of law. At issue here is the last category. This case does not implicate the Commission's ratemaking expertise but presents a pure question of law: Does the TDSIC Statute authorize the Commission to approve "project categories" or "multiple-unit projects" described using ascertainable planning criteria?

We review questions of law de novo, *Ind. Bell Tel. Co. v. Ind. Util. Regulatory Comm'n*, 715 N.E.2d 351, 354 (Ind. 1999) (citation omitted), and accord the administrative tribunal below no deference. To do otherwise would abdicate our duty to say what the law is. See, e.g., *Marbury v.*

*Madison*, 5 U.S. (1 Cranch) 137, 176 (1803). Such plenary review is "constitutionally preserved" for the judiciary, *United States Steel*, 907 N.E.2d at 1016, and considers whether the disputed "decision, ruling or order is contrary to law." *Citizens Action Coal. of Ind., Inc. v. N. Ind. Pub. Serv. Co.*, 485 N.E.2d 610, 613 (1985) (citation omitted). Such legal questions are for the courts to resolve and turn on "whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order." *United States Steel*, 907 N.E.2d at 1016.

Separation-of-powers principles do not contemplate a "tie-goes-to-the-agency" standard for reviewing administrative decisions on questions of law. In discharging our constitutional duty, we pronounce the statutory interpretation that is best and do not acquiesce in the interpretations of others. Deciding the scope of the Commission's authority under the TDSIC Statute falls squarely within our institutional charge. Crafting our State's utility law is for the legislature; implementing it is for the executive acting through the Commission; and interpreting it is for the courts.

# Discussion and Decision

## I.   Multiple-unit projects described using ascertainable criteria are not eligible for TDSIC treatment.

We conclude the TDSIC Statute does not apply to project categories or multiple-unit projects described using ascertainable criteria. The Statute requires the Commission to "designate" eligible projects in a threshold seven-year plan under Section 10. The only interpretation of "designate" that satisfies the dual statutory requirements of particularity and cost justification is one requiring projects to be identified with specificity from the outset. In addition, Section 9 "update" petitions enable the utility to obtain rate adjustments as it completes the approved projects and incurs the additional budgeted costs. The only projects consistent with Section 10's preapproval requirement are those the utility specified at the

beginning of the plan, and not "new" projects or those requiring the passage of time to specify later. The Commission erred when it authorized multiple-unit-project categories in a Section 10 proceeding and approved NIPSCO's later specification of projects under Section 9.

## A. The TDSIC Statute requires the Commission to "designate" eligible projects in a threshold seven-year plan.

A utility seeking favorable rate treatment under the TDSIC Statute for eligible infrastructure improvements must file with the Commission a proposed seven-year plan that designates the planned projects. I.C. §§ 8-1-39-2(3)(A), 8-1-39-10(a). The Commission must approve the plan if it is reasonable. *Id*. § 8-1-39-10(b). What is reasonable turns on three statutory guideposts: (i) the best-estimated cost of the improvements, (ii) their public convenience and necessity, and (iii) their cost-justified benefits. *Id*. A meaningful cost-benefit analysis requires the Commission to determine whether the estimated costs of the designated improvements are justified by their incremental benefits. *Id*. § 8-1-39-10(b)(3).

If the Commission finds the plan reasonable considering the cost-benefit analysis, it must designate and approve projects as TDSIC-eligible. *Id*. §§ 8-1-39-2(3)(A), 8-1-39-10(b). In this context, TDSIC-eligible projects are "new or replacement electric or gas transmission, distribution, or storage utility projects" that:

(1) a "utility undertakes for purposes of safety, reliability, system modernization, or economic development";
(2) "were not included in the utility's rate base in its most recent general rate case"; and
(3) were "designated" in the utility's seven-year plan that the Commission approved under Section 10.

*Id*. § 8-1-39-2. Thus, both the utility's proposed plan and the Commission-approved plan under Section 10 must "designate" the eligible improvements. A project or improvement not "designated" in the seven-year plan is not "eligible for TDSIC treatment" under Section 2.

"Designate" is an undefined statutory term. When interpreting a statute, we presume the legislature uses undefined terms in their common and ordinary meaning. *In re S.H.*, 984 N.E.2d 630, 635 (Ind. 2013). As a verb, "designate" means, among other things, "to appoint and set apart for a specific purpose" or to "specify". *Designate*, MERRIAM-WEBSTER'S DICTIONARY AND THESAURUS (2007). In TDSIC-3, the Commission approved a project category reciting ascertainable planning criteria that NIPSCO later used to select specific improvements identified in TDSIC-4. For example, NIPSCO's Section 10 petition identified two project categories—"storage" and "inspect and mitigate"—that described future asset replacements with reference to annual inspections mandated by the United States Department of Transportation. These categories necessarily were generic descriptions of NIPSCO's forthcoming projects—and not specific designations of them—because NIPSCO had not yet performed the inspections that would reveal which parts of NIPSCO's system would require replacement. That isn't NIPSCO's fault; it's not gifted with prevision. But it does mean that NIPSCO's Section 10 plan could only **describe** the projects it would undertake in the future and could not specifically **identify** them at the outset when it first sought and obtained approval for its plan. It is also why NIPSCO's specific identification of its projects did not occur until it later filed plan "updates" under Section 9. In other words, only after the Commission found the Section 10 plan reasonable was NIPSCO able to identify and prioritize specific work to be done based on a preset list of proposed replacement categories.

We conclude that "designate" in Sections 2 and 10 requires both the utility and the Commission to identify the TDSIC-eligible projects with particularity in the threshold proceeding and does not allow the approval of project categories that require a later specification based on ascertainable planning criteria. This interpretation is consistent with the further requirement that the Commission meaningfully apply the Statute's cost-benefit guideposts during the Section 10 proceeding and approve the project(s) submitted in the seven-year plan. Because Section 2 requires the Commission to designate and approve TDSIC-eligible projects only after finding a plan reasonable under Section 10, the Commission's reasonableness determination necessarily sets the budget and defines the

scope of a seven-year plan to what the Commission considered and approved in the threshold proceeding. Thus, the Commission order approving the Section 10 plan must define the plan's scope with particularity and establish a best-estimate budget for effectuating the plan. The Commission's order does not satisfy these statutory requirements.

Our view of what "designate" means in the TDSIC Statute is illustrated by Major League Baseball's designated-hitter rule. The rule, which was first implemented in the American League in 1973, allows a team to add a tenth player to the traditional nine-player lineup who will bat for the pitcher, typically the weakest hitter on the field. Before a game, each manager's lineup card must "designate" which player is to serve as the designated hitter. Major League Baseball, OFFICIAL BASEBALL RULES, Rule 4.03(c) & 5.11 (2018). The rule requires naming a specific player as the DH from the team's 25-man roster. Anything less than a player-specific identification at the outset of the game will not suffice. It is inadequate, for example, for the lineup card to describe the DH anonymously or generically as one of the fifteen (or so) remaining players on the roster. Waiting until the DH's turn at bat to identify a player doesn't comport with the rule. Such "player-to-be-named-later" designations in the lineup card don't work in baseball. And neither do "project-to-be-named-later" designations suffice under the TDSIC Statute.

## B. Section 9 update petitions cannot add new projects beyond those initially approved under Section 10 and cannot revise the seven-year-plan's budget.

After the Commission has approved the foundational seven-year plan under Section 10, the utility may file petitions every few months under Section 9 to obtain "automatic" rate adjustments for approved costs and expenditures as it completes these improvements and puts them into service. I.C. §§ 8-1-39-9(a), (c), (e). These periodic Section 9 petitions allow the utility to recoup eighty percent of approved cost estimates. *Id*. § 8-1-39-9(a). The remaining twenty percent—along with any cost overruns that are specifically justified by the utility and specifically approved by the Commission—is recoverable during the general ratemaking case required

at the end of the plan. *Id*. § 8-1-39-9(b), (d), (f). The Statute thus fixes the approved budget recoverable throughout the duration of the seven-year plan.

With each Section 9 petition a utility files, it must also "update" its seven-year plan. *Id*. § 8-1-39-9(a). "Update" also is undefined in the Statute. The best reading of "update" requires the utility to keep records and supply progress reports necessary for the lawful administration of the previously designated and approved TDSIC projects. Considering Section 2's definition of eligible improvements and Section 10's reasonableness inquiry, we conclude that a Section 9 "update" requires the utility to "identif[y] projected effects of the [seven-year plan] on retail rates and charges" and to cross-reference that progress with the approved seven-year plan. *Id*. § 8-1-39-9(a). Thus, each Section 9 petition enables the Commission to track when preapproved projects are put into service; to authorize the "timely recovery of eighty percent (80%) of approved capital expenditures and TDSIC costs", *id*.; and to prepare for the mandated general ratemaking case at the conclusion. *Id*. § 8-1-39-9(d). To be clear, Section 9 updates do not authorize the Commission to designate or approve new projects at the unit level. Rather, they should merely document changes to and developments in the administration of the previously approved Section 10 plan.

Because the Statute neither explicitly nor implicitly authorizes the Commission to approve multiple-unit projects as eligible for TDSIC treatment, NIPSCO cannot use the TDSIC mechanism to recover the multiple-unit-project portions of its Section 10 plan that either were identified with particularity for the first time in its TDSIC-4 petition or remain unspecified.

## II. Preclusion principles do not bar the Industrial Group's appeal.

Finally, we reject NIPSCO's argument that principles of claim and issue preclusion bar the Industrial Group from challenging the Commission's TDSIC-4 order. Merely because the Industrial Group could have

challenged the TDSIC-3 order, but did not, does not mean the legal methodology that order embraced is immune from legal challenge thereafter.

We look to the Restatement (Second) of Judgments to guide our preclusion analysis. See *Sullivan v. Am. Cas. Co. of Reading, Pa.*, 605 N.E.2d 134, 138 (Ind. 1992) (discussing Sections 28 & 29's adoption of the modern rule that mutuality and identity of parties are no longer required for defensive use of collateral estoppel); *Miller Brewing Co. v. Ind. Dep't of State Revenue*, 903 N.E.2d 64, 68 (Ind. 2009) (citing Section 28 for proposition that "preclusion may not apply where there are new facts or where a change in the law or legal climate would dictate a different outcome"). A noteworthy exception to general preclusion principles applies here and counsels in favor of our addressing the important legal issues presented. An issue is not precluded if "[t]he issue is one of law and … a new determination is warranted … to avoid inequitable administration of the laws", RESTATEMENT (SECOND) OF JUDGMENTS § 28(2) (1982). Nor is an issue precluded if it is "one of law and treating it as conclusively determined would inappropriately foreclose opportunities for obtaining reconsideration of the legal rule upon which it was based". *Id.* § 29(7).

Our Court will not foreclose review of a legal issue of first impression "when other litigants are free to urge that the rule should be rejected. Such preclusion might unduly delay needed changes in the law and might deprive a litigant of a right that the court was prepared to recognize for other litigants in the same position." *Id*. § 28 cmt. b.  If we were to apply preclusion principles here, that determination would foreclose "an opportunity to reconsider the applicable rule, and thus to perform [our] function of developing the law." *Id*. § 29 cmt. i. This consideration is "especially pertinent ... when the issue is of general interest and has not been resolved by the highest appellate court that can resolve it." *Id*.

To be sure, the Industrial Group's failure to appeal the TDSIC-3 order does mean, as the Group acknowledges, that specific projects identified and approved in TDSIC-3 are beyond challenge. But the Group's failure to challenge TDSIC-3 does not bar the Group from challenging previously

undesignated and unapproved projects for which NIPSCO sought and obtained rate adjustments from the Commission in TDSIC-4.

The Commission's legal methodology of approving multiple-unit-project categories described using ascertainable planning criteria is a pure issue of law, of general interest, that we have not previously resolved. And we conclude its methodology remains subject to challenge here. Indiana courts have long held that agencies remain free to correct their own erroneous interpretations of statutes in later proceedings. *Adkins v. City of Tell City*, 625 N.E.2d 1298, 1302 (Ind. Ct. App. 1993); *State ex rel. ANR Pipeline Co. v. Ind. Dep't of State Revenue*, 672 N.E.2d 91, 94 (Ind. Tax Ct. 1996). We decline to adopt a preclusion theory that prevents litigants from urging such a course correction.

# Conclusion

We hold that periodic rate increases are available only for specific projects a utility designates in the threshold TDSIC proceeding and not for multiple-unit-project categories it describes using ascertainable planning criteria. The Commission thus erred in approving various proposed categories of unspecified improvements that NIPSCO did not identify with particularity until it filed subsequent periodic Section 9 petitions. For these reasons, we grant the Industrial Group's petition to transfer. We reverse the portions of the Commission's TDSIC-4 Order that approved previously unspecified improvements. And we remand to the Commission with instructions to identify such project categories that were not identified with specificity in TDSIC-3. The costs for all multiple-unit projects as to which particular improvements were identified for the first time in TDSIC-4 are disallowed for TDSIC recovery to the extent those projects were not properly designated in the previously approved seven-year plan.

Rush, C.J., and David, Massa, and Goff, JJ., concur.

ATTORNEYS FOR APPELLANT

Todd A. Richardson

Joseph P. Rompala

Lewis Kappes, P.C.

Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Brian J. Paul

Daniel E. Pulliam

Faegre Baker Daniels LLP

Indianapolis, Indiana

Claudia J. Earls

Christopher C. Earle

NiSource Corporate Services – Legal

Indianapolis, Indiana