## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 11 2019, 5:29 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jennifer A. Washburn
Margo Tucker
Citizens Action Coalition of Indiana, Inc.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Robert E. Heidorn
P. Jason Stephenson
Vectren Corporation
Evansville, Indiana

Wayne C. Turner
Patrick A. Ziepolt
Hoover Hull Turner LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Citizens Action Coalition of Indiana, Inc.,

*Appellant-Intervenor*,

v.

Southern Indiana Gas & Electric Company d/b/a Vectren Energy Delivery of Indiana, Inc.,

*Appellee-Petitioner*.

March 11, 2019

Court of Appeals Case No. 18A-EX-95

Appeal from the Indiana Utility Regulatory Commission

The Honorable David E. Ziegner, Commissioner

The Honorable Loraine L. Seyfried, Chief Administrative Law Judge

IURC Cause No. 44645

**Brown, Judge.**

[1]  Southern Indiana Gas & Electric Company d/b/a Vectren Energy Delivery of Indiana, Inc. ("Vectren South" or "Petitioner") filed a petition with the Indiana Utility Regulatory Commission ("Commission") seeking approval of its energy-efficiency Electric Demand Side Management ("DSM") Plan for 2016-2017 ("Plan"). Citizens Action Coalition of Indiana, Inc. ("CAC") intervened in the proceeding. The Commission held an evidentiary hearing and issued its decision that approved the Plan but limited Vectren South's lost revenue recovery. Vectren South appealed, arguing that the Commission erred when it found the Plan to be reasonable in its entirety but then capped lost revenue recovery at four years. Vectren South further argued that the cap was arbitrary and capricious because the Commission made no specific factual findings that the cap would allow for the recovery of reasonable lost revenues. We agreed on both counts, reversed the Commission's order in part, and remanded the case to the Commission for additional findings. *S. Ind. Gas & Elec. Co. v. Ind. Util. Reg. Comm'n*, No. 93A02-1604-EX-914, slip op. at 1 (March 7, 2017). On remand, and following an evidentiary hearing,[1] the Commission issued its decision ("Order on Remand") approving Vectren South's Plan that included a revised lost revenue recovery proposal that Vectren South had presented. CAC now

---

[1] We note that "[a] party of record in the trial court or Administrative Agency shall be a party on appeal." Ind. Appellate Rule 17(A). Indiana Industrial Group was an intervenor below but did not file a brief with this Court.

appeals from the Commission's Order on Remand, raising the following issues which we consolidate and restate as follows:

> I. Whether the Commission's Order on Remand is contrary to law;
>
> II. Whether the Commission's Order on Remand impermissibly deviates from precedent; and
>
> III. Whether the Commission's Order on Remand is supported by substantial evidence.

We affirm.

### Facts and Procedural History

Vectren South is a public utility based in Evansville that provides electric utility service to approximately 140,000 customers in six counties in southwestern Indiana. In 2015, the General Assembly passed a statute, Indiana Code § 8-1-8.5-10 (2015) ("Section 10"), requiring electricity suppliers[2] to periodically present to the Commission energy-efficiency ("EE") plans, goals, and programs[3] for approval by the Commission beginning no later than 2017. *See* Ind. Code § 8-1-8.5-10(h). The statute specifically provides as follows:

---

[2] "Electricity supplier" means a public utility "that furnishes retail electric service to customers in Indiana." Ind. Code § 8-1-8.5-10(a). The term does not include a municipally owned utility and certain other corporations. *Id.*

[3] "Energy efficiency" means "a reduction in electricity use for a comparable level of electricity service." Ind. Code § 8-1-8.5-10(b). "Energy efficiency goals" means "all energy efficiency produced by cost effective plans

(h) Beginning not later than calendar year 2017, and not less than one (1) time every three (3) years, an electricity supplier shall petition the commission for approval of a plan that includes:

> (1) energy efficiency goals;

> (2) energy efficiency programs to achieve the energy efficiency goals;

> (3) program budgets and program costs; and

> (4) evaluation, measurement, and verification [("EM&V")[4]] procedures that must include independent evaluation, measurement, and verification.

An electricity supplier may submit a plan required under this subsection to the commission for a determination of the overall reasonableness of the plan[5] either as part of a general basic rate proceeding or as an independent proceeding.

---

that are: (1) reasonably achievable; (2) consistent with an electricity supplier's integrated resource plan; and (3) designed to achieve an optimal balance of energy resources in an electricity supplier's service territory." Ind. Code § 8-1-8.5-10(c). "Energy efficiency program" or "program" means "a program that is: (1) sponsored by an electricity supplier; and (2) designed to implement energy efficiency improvements. The term does not include a program designed primarily to reduce demand for limited intervals of time, such as during peak electricity usage or emergency conditions." Ind. Code § 8-1-8.5-10(d).

[4] "Evaluation, measurement, and verification (EM&V) is the collection of methods and processes used to assess the performance of energy efficiency activities so planned results can be achieved with greater certainty and future activities can be more effective." DEPT. OF ENERGY, EVALUATION, MEASUREMENT, AND VERIFICATION OF ENERGY DATA, https://www.energy.gov/eere/slsc/evaluation-measurement-and-verification-energy-data (last visited Jan. 15, 2019).

[5] In determining the overall reasonableness of the plan, the Commission is required to consider ten factors. *See* Ind. Code § 8-1-8.5-10(j).

*Id*.

As an incentive for participation, the General Assembly included provisions within the statute allowing electricity suppliers, such as Vectren South, to recover certain costs associated with their EE plans, including lost revenues.[6] *See* Ind. Code § 8-1-8.5-10(o) ("If the commission finds a plan submitted by an electricity supplier under subsection (h) to be reasonable, the commission shall allow the electricity supplier to recover or receive the following: . . . (2) Reasonable lost revenues."). In other words, and as explained by Vectren South: "When the Commission approves an energy-efficiency plan, [Ind. Code § 8-1-8.5-10(o)] requires it to approve an adjustment to the utility's electric rate, the amount charged to consumers, to compensate the utility for lost revenues it would have received without these programs designed to [lower energy consumption and, ultimately,] reduce its sales." Appellee's Brief at 9.

On June 29, 2015, Vectren South filed a petition with the Commission seeking approval of its Plan, which outlined Vectren South's EE programs and their budgets and costs and included lost revenues resulting from reduced demand for electricity. On July 6, 2015, CAC filed a petition to intervene, which was

---

[6] Lost revenues can be described as: "an estimation of the amount of lost sales attributable to the energy efficiency programs. . . ." Exhibits at 19. According to Vectren South, "the purpose of lost revenue recovery is to return the utility to the position it would have been in absent the implementation of the EE measures." *Id.* at 20.

granted on August 3, 2015.  The Commission held an evidentiary hearing[7] and, on March 23, 2016, it issued an order ("First Order") finding the Plan to be reasonable in its entirety but limiting lost revenue recovery to "four years or the life of the [EE] measure, whichever is less, or. . . until rates are implemented pursuant to a final order in Vectren South's next base rate case,[8] whichever occurs earlier."  Appellant's [Vectren South] Appendix 2 at 31.

[5]  Vectren South appealed the First Order, arguing that the Commission erred in finding the Plan to be reasonable in its entirety but capping lost revenue recovery at four years.  Vectren South also argued that the cap was arbitrary and capricious because the Commission made no specific factual findings that the cap would allow for the recovery of reasonable lost revenues.  On March 7, 2017, this Court issued a memorandum decision, agreeing with Vectren South on both counts.  *S. Ind. Gas & Elec. Co.*, No. 93A02-1604-EX-914.  We reversed a portion of the First Order and remanded to the Commission with instructions that it could either:

> (1) issue specific factual findings to justify its implicit determination that Vectren South's lost revenue recovery proposals are unreasonable, determine that the Plan is not reasonable in its entirety pursuant to Section 10(m), and allow Vectren South to submit a modified plan within a reasonable

[7] During this proceeding, the Commission heard evidence from Vectren South, from statutory party Indiana Office of Utility Consumer Counselor ("OUCC"), and from CAC.

[8] "[A] rate case resets base [utility] rates and effectively zeros out . . . any lost revenue recovery[.]"  Transcript at 28.

time; or (2) issue specific factual findings to justify a determination that the Plan is in fact reasonable in its entirety pursuant to Section 10(k) and allow Vectren South to recover reasonable lost revenues in accordance with the Plan.

*Id*. at 7.

On remand, Vectren South presented a revised lost revenue recovery proposal ("Revised Lost Revenue Proposal") that was described in the Commission's Order on Remand through testimony provided by Rina H. Harris ("Ms. Harris"), Director of Energy Efficiency for Vectren Utility Holdings, Inc., at an evidentiary hearing held by the Commission on September 5, 2017:

> Ms. Harris described Vectren South's [Revised Lost Revenue Proposal as basing] lost revenues on: (1) the weighted average measure life ("WAML")[9] of the Plan; and (2) a 10% reduction in annual savings. Using this method, Vectren South would recover the reasonable amount of lost revenues associated with the WAML of its EE programs or the measure life, whichever is less. The WAML of the portfolio would be re-evaluated and adjusted with each EE filing. [Ms. Harris] said that in using this approach, Vectren South first determines the weighted average life of each program by weighting the energy savings for each

---

[9] "Measure" is defined in pertinent part as "[s]pecific energy efficiency activities or equipment." DEPT. OF ENERGY, ENERGY EFFICIENCY & RENEWABLE ENERGY 1, https://www.energy.gov/sites/prod/files/2014/ 05/f16/ what_is_emv.pdf (last visited Jan. 15, 2019).

"Measure life" is widely defined as "the average/median life over many data points, or customer experiences, of a particular EE program. It takes into consideration variations in the useful life of an EE measure among different types of customers by developing an average. [For example, a]n LED could last 5 years in one home, 11 years in another and 30 years in another – with an average of 15 years." Exhibits at 27.

Weighted average measure life ("WAML") "is the average life [of a measure or a program], weighted by savings in years." *Id*. at 24.

measure included in the program. Next, Vectren South calculates the weighted average measure life of a portfolio by weighting the energy savings of each program included in the portfolio. To determine individual measure lives, Vectren South uses the latest Indiana Technical Resource Manual[10] ("TRM") for evaluation. Ms. Harris stated that capping recovery of lost revenues based upon WAML is reasonable because it limits lost revenue recovery based on the average equipment life and measure persistence of the entire program plan. In addition, only 90% of annual savings would be recovered, reflecting the statistical certainty EM&V providers can obtain for energy savings.

Appellant's Appendix Volume 2 at 10-11. Vectren South maintained that, under the Revised Lost Revenue Proposal, it was not seeking to recover its estimate of $34.3 million in lost revenue or sales, but rather "only about $26 million, or approximately $2.9 million per year." Appellee's Brief at 28.

[7] CAC argued for Vectren South's lost revenue collection to be the lesser of four years or the Plan's measure life. A witness for CAC, Karl R. Rábago ("Mr. Rábago"), the principal of Rábago Energy, LLC, testified that any lost revenue adjustment mechanism ("LRAM")[11] must be limited to a maximum duration of

---

[10] Per testimony provided at the evidentiary hearing, the Technical Resource Manual "[is] a planning document that has a lot of equations and algorithms to help utilities plan for what energy savings are . . . ." Transcript at 62.

[11] "Lost Revenue Adjustment Mechanism (LRAM) is a rate adjustment mechanism that allows the utility to recover revenues that are 'lost' due to energy savings from approved energy efficiency programs." Sara Hayes et al., *Balancing Interests: A Review of Lost Revenue Adjustment Mechanisms for Utility Energy Efficiency Programs*, 1 (September 2011) American Counsel for an Energy-Efficient Economy, https://aceee.org/sites/default/files/publications/researchreports/u114.pdf (last visited Jan. 15, 2019).

four years to be reasonable. He compared the dollar amounts between Vectren South's original lifetime lost revenue recovery proposal, the Revised Lost Revenue Proposal, and CAC's proposal to cap lost revenue recovery at four years or the life of the measure, whichever is shorter. He determined that, under Vectren South's original lost revenue recovery proposal, ratepayers would pay $34.3 million in lost revenues for a program that costs $16.8 million to implement. He maintained that although the total amount of lost revenues under the Revised Lost Revenue Proposal would be less, $25.9 million, this amount in lost revenues for "$16.8 million in actual program delivery is unreasonable." Exhibits at 101. Mr. Rábago further testified that, under CAC's four-year-cap proposal, total lost revenues would amount to $14.4 million.

[8] CAC also argued that testimony from a Vectren South witness, Dr. M. Sami Khawaja ("Dr. Khawaja"), Chief Economist at The Cadmus Group (an energy efficiency evaluation firm), created a conflict of interest and should be disregarded because The Cadmus Group had been retained by Vectren South to perform evaluation services for the past eight years. According to CAC, Section 10 requires that the EM&V procedures be independent, and that Dr. Khawaja's advocacy position "in this proceeding . . . casts doubt on the integrity of the firm's work as an independent evaluator." *Id.* at 114.

[9] The Commission determined that "the only issue we need to address in this proceeding [on remand] is the reasonableness of Vectren South's [Revised Lost Revenue Proposal]." Appellant's Appendix Volume 2 at 16. Thus, on

December 20, 2017, the Commission issued its twelve-page Order on Remand, concluding that "Vectren South's modified lost revenue recovery proposal, which has a strong relationship with the EM&V process, is reasonable." *Id*. at 18. The Order reads in pertinent part:

Vectren South proposed a modified approach to its initial proposal for lost revenue recovery, which caps lost revenue recovery associated with its Plan by using the WAML of the Plan programs and reduces the resulting recovery by an additional 10%. . . . Thus, the proposed LRAM is projected to recover slightly less than $26 million of lost revenues over the nine-year WAML of the Plan or, on average, approximately $2.9 million per year.

* * * * *

CAC argues that a four-year cap on lost revenue recovery is reasonable because a term greater than four years creates unreasonable difficulties in tracking the accuracy of lost revenues [and] the pancaking or cumulative effect of lost revenues over time on rates[;] and lost revenue policies were created at a time when the period between rate cases was shorter.

Based on the evidence presented as further discussed below, we find Vectren South's modified proposal for lost revenue recovery is reasonable and approve the Plan in its entirety. It is commonly understood that the calculation of lost revenues is not an exact science and there will always be a range of what may be considered reasonable lost revenue recovery. Vectren South has sufficiently demonstrated that its WAML proposal is grounded in the EM&V processes that are required by Section 10 and universally relied upon in the utility industry to estimate energy savings and associated lost revenues. The other parties did not provide us with evidence demonstrating that Vectren South's

proposal is unreasonable. Nor did they provide us with sufficient facts from which we could determine that a four-year (or less) cap on lost revenue recovery would allow Vectren South to recover reasonable lost revenues.

* * * * *

In addition to the use of the nine-year WAML, Vectren South proposes to recover only 90% of the annual energy savings. CAC and other parties, in their post-hearing filing, argue that because EM&V is only conducted once for each Plan year, the initial determination of energy savings and lost revenue becomes progressively less reliable and more uncertain in successive years and therefore should not be relied upon. Further, they argue that the proposed 10% reduction in energy savings only addresses the degree of confidence in the threshold EM&V determination, not the eroding reliability of assumed savings.

EM&V is the most established approach to reasonably estimating energy savings and lost revenues associated with EE programs. Vectren South's approach appears reasonably designed to ensure it recovers only the lost revenues that EM&V can establish, with a high degree of confidence, [and that] will result from savings driven by EE measures. Recognizing that estimates are more certain in the immediate as opposed to the distant future, Vectren South's evaluation process for estimating net energy savings . . . results in a statistically conservative estimate. While we recognize that EM&V degrades over time based on accumulating changes, this degradation is built into the EM&V process. We further find that the approximate 24% reduction in recovered lost revenues compared to Petitioner's initial [revenue recovery] proposal is intended to strike a reasonable balance in terms of offsetting the inherent financial harm to a utility caused by EE sales reductions, while also ensuring the recoveries are fully supported by conservative EM&V estimates that safeguard the

cost and benefit analysis relied upon to determine that the EE Plan provides short- and long-term benefits to customers.

* * * * *

Rather than providing a reasoned explanation or analysis to support ending lost revenue recovery after four years[,] regardless of measure life[,] or evidence related to the financial effects of such a proposal on Petitioner, CAC instead offers a conclusory opinion that the magnitude of lost revenues exceeds the program costs, which makes the proposal unreasonable. CAC provided no factual basis to support its contention that lost revenues should not exceed program costs. . . . [C]ost-effective EE programs should have lower program[] costs with larger energy savings, which does result in higher lost revenues relative to program costs.

* * * * *

Section 10(o) similarly recognizes the importance of subjecting lost revenues to EM&V. Vectren South's [Revised Lost Revenue P]roposal recognizes that the EM&V process is not a perfect science. It also employs limitations on EM&V quantification of savings (and thus lost revenues) that ensure customers are billed for lost revenues based on a conservative determination of achieved savings with the highest level of confidence in the energy savings attributed to EE measures. Accordingly, we find Vectren South's Plan is reasonable and approved.

*Id*. at 17-19.

Regarding whether testimony from Dr. Khawaja should have been disregarded, the Commission determined that:

Dr. Khawaja's testimony was largely limited to addressing the reasonableness of EM&V results over time and how the issues of uncertainty and persistence are accounted for in the EM&V process and methodology. While it may have been more prudent for Petitioner to retain an EM&V witness not associated with Cadmus, we lack sufficient evidence to find that EM&V independence has been undermined – particularly given the request for proposal process for selecting the EM&V entity and the ongoing participation by members of the [Vectren Oversight Board[12]] in the review of the EM&V analysis and reports.

*Id.* at 18.

CAC now appeals the Commission's Order on Remand. This is the second appeal related to Vectren South's Plan for calendar years 2016-2017.

## *Discussion*

## *Standard of Review*

The General Assembly created the Commission primarily as a factfinding body with the technical expertise to administer the regulatory scheme devised by the legislature. *N. Ind. Pub. Serv. Co. v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1015 (Ind. 2009). The Commission's assignment is to insure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana. *Id.* "The Commission can exercise only power conferred upon it by statute." *Id.* "Because the complicated process of ratemaking is a legislative rather than

---

[12] The Vectren Oversight Board is Vectren South's EE program governance body. Both CAC and OUCC are voting members of the Board.

judicial function, it is more properly left to the experienced and expert opinion present in the Commission." *Citizens Action Coal. of Ind., Inc. v. N. Ind. Pub. Serv. Co.*, 76 N.E.3d 144, 151 (Ind. Ct. App. 2017) (internal quotations omitted).

[13] Indiana Code § 8-1-3-1 (1993) authorizes judicial review of Commission orders by this Court. The review involves multiple tiers. *U.S. Steel*, 907 N.E.2d at 1016. "On the first level, it requires a review of whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. Such determinations of basic fact are reviewed under a substantial evidence standard, meaning the order will stand unless no substantial evidence supports it." *Id.* (citation and footnote omitted). We neither reweigh evidence nor assess witness credibility, and we consider only the evidence favorable to the Commission's findings. *Id.* The Commission's order is not binding if it lacks substantial evidence supporting the findings of the Commission or is unreasonable or arbitrary. *Id.*

[14] "At the second level, the order must contain specific findings on all the factual determinations material to its ultimate conclusions." *Id.* We review the Commission's conclusions of ultimate facts for reasonableness, the deference of which is based on the amount of expertise exercised by the agency. *Id.* If the order involves a subject within the Commission's special competence, we should give it greater deference; if the subject is outside the Commission's expertise, we give it less deference. *Id.* "More specifically, on matters within its jurisdiction, [the Commission] enjoys wide discretion and its findings and decision will not be lightly overridden simply because we might reach a

different decision on the same evidence." *Citizens Action Coal. of Ind., Inc.*, 76 N.E.3d at 151 (brackets and internal quotation omitted). "Essentially, so long as there is any substantial evidence to support the rates as fixed by the Commission as reasonable, the judicial branch of the government will not interfere with such legislative functions and has no power or authority to substitute its personal judgment for what it might think is fair or reasonable in lieu of [the Commission's] administrative judgment." *Id*. (brackets, emphasis, and internal quotations omitted).

[15] Findings of fact are important because they help us understand the Commission's reasoning and policy judgments and allow for a reasoned and informed basis of review, which decreases the likelihood that we will substitute our judgment on complex evidentiary issues and policy determinations best left to an agency with technical expertise. *N. Ind. Pub. Serv. Co. v. LaPorte*, 791 N.E.2d 271, 278 (Ind. Ct. App. 2003). Further, requiring findings of fact helps the Commission avoid arbitrary and capricious action. *Id*.

[16] "Additionally, an agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order." *U.S. Steel*, 907 N.E.2d at 1016.

## I. Whether the Commission's Order on Remand is Contrary to Law

CAC's first argument is twofold.  It contends that the Commission's Order on Remand is contrary to law because the approval of Vectren South's Revised Lost Revenue Proposal is unreasonable, and that it is inconsistent with Section 10.  We address each argument in turn.

## A. Whether the Approval of the Revised Lost Revenue Proposal is Unreasonable

CAC maintains that the Commission should have reviewed Vectren South's overall financial condition when it determined whether the Revised Lost Revenue Proposal was reasonable and just.  The crux of CAC's argument is that:

> [b]ecause the Commission[, in approving the Revised Lost Revenue Proposal,] has ignored the requirement that each utility's rates must be set on the utility's overall financial condition including total revenue and expense, the approval of Vectren [South]'s lost revenue rate recovery in the [Order on Remand] is not just and reasonable, and should be declared unlawful by this Court.

Appellant's Brief at 28.  According to CAC:

> [t]he approved lost revenue rate in the [Commission's Order on Remand] just guarantees rate recovery based on projected savings without any consideration for other ratemaking principles.  It also disregards the distinction between a utility who comes in for regular rate cases, regularly zeroing out lost revenue totals when resetting rates, versus a utility who does not reset rates but for once every 10, 15, 20 years, resulting in exorbitant lost revenue

> rate recovery and millions of dollars in difference in terms of what the ratepayers is [sic] required to pay.

*Id*. at 27.  CAC also argues that to allow Vectren South to recover the requested amount dissuades Vectren South from filing general rate cases.[13]

CAC further argues that the Revised Lost Revenue Proposal is unreasonable because it allows Vectren South to recover $25.9 million in lost revenue for EE programs projected to cost $16.8 million to administer.  It states that "lost revenue rates at 1.54 times greater than the cost to actually run the programs is far in excess of what is necessary to satisfy a monopoly utility's shareholders' *legitimate* expectations."  *Id*. at 25-26.  CAC claims that "[t]his lost revenue is outside the zone of reasonableness in light of the legal framework, ratemaking policy, regulatory history, objective of the required cost-effectiveness in the statute, and the appropriate degree of reliability in forecasting estimated savings out beyond a few immediate years."  *Id*. at 26.  CAC contends that "it is particularly wasteful and results in artificially high prices to award a utility 1.54 times more in revenue than costs to run the energy efficiency programs with no

---

[13] CAC posits that the approval of lost revenues is subject to a "just and reasonable" rates standard under Indiana Code § 8-1-2-4 (1984), the general rate statute, which provides in relevant part that "[t]he charge made by any public utility for any service rendered or to be rendered either directly or in connection therewith shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful." However, in its Surreply Brief, CAC clarifies that in referencing the statute, it was not raising a new argument.  CAC acknowledges that it should have been more careful with its phrasing, but that "the point . . . is this: by failing to consider its precedent of capping the time a lost revenue rate adjustment mechanism may be used due to Indiana's environment of infrequent rate cases, the Commission brings the just and reasonable rates requirement from I.C. § 8-1-2-4 and the examination of the utility's overall financial condition to the forefront . . . ."  Appellant's Surreply Brief at 6.

shown correlation that this extra revenue will equate to more energy efficiency services or savings." *Id*. at 27.

[20]     We are not persuaded by CAC's arguments. The only disputed factor on remand was Vectren South's Revised Lost Revenue Proposal. Section 10(j)(8) provides that, when the Commission makes a determination of the overall reasonableness of a plan, it must consider the lost revenues and financial incentives associated with the plan and sought to be recovered or received by the utility. Section 10(o) provides that if the Commission finds a plan submitted by a utility to be reasonable then the Commission must allow the utility to recover or receive reasonable lost revenues. Here, the Commission considered the lost revenues sought to be recovered and determined that CAC "provided no factual basis to support its contention that lost revenues should not exceed program costs." Appellant's Appendix Volume 2 at 18. Furthermore, Section 10 does not require the Commission to consider a utility's overall financial condition in determining whether lost revenues sought to be recovered are reasonable or whether recovery of the requested lost revenue dissuades Vectren South from filing general rate cases.[14] As such, the

---

[14] *Cf. NIPSCO Indus. Grp. v. N. Ind. Pub. Serv. Co.*, 100 N.E.3d 234, 238 (Ind. 2018) ("*General ratemaking* is a 'comprehensive' process, requiring the Commission to 'examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data [the Commission] has received are representative of operating conditions that will, or should, prevail in future years.'" (emphasis added and citation omitted)), *modified on reh'g*.

Commission did not act contrary to law in determining that Vectren South's Plan was reasonable.

## B. Whether the Approval of the Revised Lost Revenue Proposal is inconsistent with Section 10

[21] CAC also argues that the Commission's approval of the Revised Lost Revenue Proposal is inconsistent with Section 10. It contends that the Commission's Order on Remand "misinterprets and misconstrues" that section by "establishing rates under Section 10 without any reference or consideration of ratemaking practices and the requirements of Indiana's Public Service Commission Act ('PSCA')." Appellant's Brief at 36. CAC specifically argues that "the most basic error is the Commission's failure to reconcile its approval of [the Revised Lost Revenue Proposal] without any reference or application of ratemaking policies" and the Commission's failure to "consider ratepayers in making a determination as to the reasonableness of this rate." *Id*.

[22] We observe that the requirement under Section 10 that electricity suppliers file a three-year EE plan was adopted by our General Assembly in 2015 as a separate requirement that is *in addition to* long-standing requirements regarding general ratemaking. CAC points to no relevant authority indicating that the Commission was required to consider or apply procedures adopted in connection with general ratemaking cases when considering a petition filed in accordance with Section 10. CAC has failed to establish that the Commission's approval of Vectren South's Revised Lost Revenue Proposal is inconsistent with Section 10. We, therefore, find that the Commission's approval of the

Revised Lost Revenue Proposal was not inconsistent with Section 10 and was not contrary to law.

## II. Whether the Commission's Order on Remand Impermissibly Deviates from Precedent

We next address whether the Commission impermissibly deviated from precedent. CAC maintains that the Commission's Order on Remand "ignores available precedent related to the relationship between lost revenues and general rate cases that articulated principles by which to ascertain the reasonableness of lost revenue recovery proposals." Appellant's Brief at 29. According to CAC, "the relationship between rate cases and lost revenues, as articulated in the Commission's [First] Order and other available precedent, was a material issue raised and put in dispute by the parties before the Commission in this remand proceeding, but it went unaddressed." *Id*.

In support of its argument, CAC cites to four Commission decisions. *See In re Ind. Power & Light Co.*, Cause No. 43911, 2010 WL 4499412, at *9 (November 4, 2010) (denied lost revenue recovery "in absence of a base rate case to ensure that class specific investment and investment recovery is properly aligned"); *In re N. Ind. Pub. Serv. Co.*, Cause No. 43912, 2011 WL 3346770, at *22 (July 27, 2011) (denied request to recover lost margins but remained "willing to consider a request for lost margins, provided NIPSCO can demonstrate the revenue margin rates are reasonably reflective of today's operations"); *In re N. Ind. Pub. Serv. Co.*, Cause No. 44634, 2015 WL 9605053, at *30, 31 (December 30, 2015) (Commission acknowledged that it had "previously approved lost revenues over

a measure's life or until a utility's next base rate case, whichever is shorter," but due to "concerns with pancaking and the increased length of time between base rate cases for utilities in Indiana," ultimately found NIPSCO's lost revenue recovery should be limited to "(1) four years or the life of the measure, whichever is less, or (2) until rates are implemented pursuant to a final order in NIPSCO's next base rate case, whichever occurs earlier."); *In re Duke Energy Ind., Inc.*, Cause No. 43955, 2016 WL 1118794 (March 16, 2016) (denied approval of Duke's EE plan, finding, in part, that recovery of lost revenues should be limited to four-year term). However, nothing in our review of these decisions leads us to the conclusion that reversal is required in this case.

[25] By its own acknowledgement, the Commission has previously approved the recovery of lost revenues over a measure's life or until the utility's next base rate case, whichever is shorter. The Commission has also previously approved a four-year cap on a utility's lost revenue recovery. An agency may change its course and is not forever bound by prior policy or precedent as long as it explains its reasons for doing so. *See Ind. Bell Tel. Co. v. Ind. Util. Reg. Comm'n*, 810 N.E.2d 1179, 1186 (Ind. Ct. App. 2004), *trans. denied*. In its Order on Remand, the Commission found Vectren South's Plan to be reasonable in its entirety, found Vectren South's Revised Lost Revenue Proposal to be reasonable, and explained its reasons for doing so. The Commission did not impermissibly deviate from precedent.

### III. Whether Substantial Evidence Supports the Commission's Order on Remand

CAC's last argument is that the Commission's Order on Remand "lacks a reasonably sound basis of evidentiary support." Appellant's Brief at 33. Specifically, CAC maintains that 1) the Commission failed to consider the "relationship of the lost revenue rate with the resetting of rates in general rate cases"; 2) the Order on Remand failed to "mention or weigh any of the critical cross-examination that was conducted by the other consumer parties"; and 3) the Order on Remand failed to mention certain evidence of record from the underlying proceeding, namely, a white paper from the American Council for an Energy-Efficient Economy. *Id.* at 33-34, 35.

Our inquiry here is limited to whether there is substantial evidence supporting the Commission's Order on Remand. *U.S. Steel*, 907 N.E.2d at 1016. We neither reweigh evidence nor assess witness credibility, and we consider only the evidence favorable to the Commission's findings. *Id.* Here, the record reveals the following substantial evidence supporting the Commission's Order on Remand and its ultimate approval of Vectren South's Revised Lost Revenue Proposal.

Testifying for Vectren South, Ms. Harris explained in detail how Vectren South calculates lost revenues. She testified that it is reasonable to collect lost revenues for the Plan for the life of the measure because "utility revenues continue to be reduced over time by energy efficiency measures or programs each year for the life of the measure"; thus, "[i]t is reasonable to match the

ability to recover lost revenues for the programs over the same life which is used to determine a program's cost effectiveness." Exhibits at 22. She added that Vectren South's EE programs "undergo rigorous, independent, third-party [EM&V] process to determine the actual program savings which are used to determine cost effectiveness of programs and also serve as the basis for the lost revenue calculation." *Id*. She explained how the EM&V results would be applied in the calculation of the lost revenues, why a four-year cap on the recovery of lost revenues was not appropriate and would cause financial harm to Vectren South, and how and why Vectren South's Revised Lost Revenue Proposal, based on "(1) the weighted average measure life ('WAML') of the [Plan] period[,] and (2) a 10% reduction in annual savings," provides "even greater assurance customers are paying only for lost revenues that result from EE measures." *Id*. at 24. She further explained that under the Revised Lost Revenue Proposal, "Vectren South would recover the reasonable amount of lost revenues associated with the weighted average measure life of its EE programs or the measure life, whichever is less," and that the WAML of the portfolio would be re-evaluated and adjusted with each EE filing." *Id*. On rebuttal, she testified to "two key factors" associated with Vectren South's Revised Lost Revenue Proposal "that make it superior to the approaches recommended by the OUCC and CAC and they are: (1) lost revenue recovery remains connected to measure life; and (2) lost revenue recovery remains connected to EM&V, which has been relied upon for decades in the determination of lost revenues." *Id*. at 45.

[29] Dr. Khawaja, who has conducted impact evaluation studies for energy efficiency programs for nearly thirty-five years and is an expert in evaluation methods, also testified for Vectren South and described the EM&V process utilized for it. He explained that confidence and precision energy program evaluation is "typically based on estimating energy impacts using a representative sample of program participants to determine how measures are installed and used." *Id*. at 54. He stated that the results of these efforts are then used to estimate savings for the program and that, for Vectren South, "program evaluations are in line with the industry standard of obtaining estimates with a confidence level of 90% with a relative precision of ±10%." *Id*. He testified that it is appropriate to recover lost revenues for the life of a measure and to cap lost revenue based upon the WAML of a plan; and, he expressed his concerns regarding placing a four-year cap on lost revenue recovery. In summary, he stated:

> In my view, Vectren South's use of evaluation results, combined with the [effective useful lives ("EUL")] of program measures, is a conservative basis for the calculation of lost revenues.

> First, the EUL values used are conservative (Vectren South estimate of weighted average life is 9 (rounded from 8.5) years while the same estimate based on industry values is 9.5 years).

> Second, Vectren South's evaluation process for estimating net energy savings utilizes at minimum a 90% confidence interval (industry accepted standard). Vectren South supports a 10% degradation of annual savings within its lost revenue calculation.

This reflects using the lower end of the confidence interval which is also statistically conservative. . . .

Finally, it is extremely likely that lost revenues are far in excess of those claimed due to the significant amount of market effects caused by utility DSM programs.

*Id.* at 58.

[30]     Scott E. Albertson ("Mr. Albertson"), Vice President of Regulatory Affairs and Gas Supply for Vectren Utilities Holdings, Inc., also testified on behalf of Vectren South and addressed concerns regarding the frequency of rate cases and the concept of pancaking lost revenues. When asked if the frequency of a utility's rate cases contribute to the magnitude of lost revenues, he replied as follows:

> Yes and no. While the costs recovered via an LRAM (i.e.[,] a lost revenue adjustment mechanism) would be lessened if rate cases were filed more frequently, the revenues lost as a result of EE are included in base rates each time the utility files a rate case. In either case, the appropriate level of fixed costs will be included in customers' bills. Customer usage at the time of a rate case reflects the usage reductions resulting from EE, thus increasing unit rates as needed to recoup fixed costs. So[,] whether via an LRAM or new base rates, the utility should recover the revenues needed to recover the approved level of fixed costs. An LRAM cap is merely a temporary limit on recovery which may force utilities into rate cases sooner and more frequently than would have otherwise been the case had the period of lost revenue recovery matched the lives of EE measures implemented by customers. And, as noted by the Court of Appeals, rate cases are "expensive, time consuming, and sometimes result in large, sudden rate hikes for customers."

Thus, capping lost revenue recovery to force utilities to file a rate case is not good public policy.

*Id*. at 68. He further testified that if a four-year cap on lost revenue recovery were implemented, a utility would be incented to offer only programs that have lives of four years or less, and that "[i]t simply would not make sense to embed such a perverse incentive into the EE Program framework." *Id*. at 69. On rebuttal, Mr. Albertson testified that Vectren South's Revised Lost Revenue Proposal sets a reasonable limit on the recovery of lost revenues. He refuted claims by Mr. Rábago that, under the Revised Lost Revenue Proposal, Vectren South would over-recover lost revenues. He further testified that Mr. Rábago "has provided no specific evidence to support that a [four-year] cap would allow Vectren South reasonable lost revenue recovery." *Id*. at 76.

[31]    The Commission reviewed the evidence and determined that Vectren South's Revised Lost Revenue Proposal was reasonable, and that Vectren South's Plan was reasonable in its entirety. The Commission found that "the calculation of lost revenues is not an exact science"; that "there will always be a range of what may be considered reasonable lost revenue recovery"; and that "Vectren South . . . sufficiently demonstrated that its [Revised Lost Revenue Proposal] is grounded in the EM&V processes that are required by Section 10 and universally relied upon in the utility industry to estimate energy savings and associated lost revenues." Appellant's Appendix Volume 2 at 17. The Commission was unpersuaded by CAC's arguments regarding a four-year cap on lost revenue recovery and further found that CAC did not provide it with

evidence "demonstrating that Vectren South's proposal is unreasonable" or with "sufficient facts from which [it] could determine that a four-year (or less) cap on lost revenue would allow Vectren South to recover reasonable lost revenues." *Id.* The Commission also found that "[r]ather than providing a reasoned explanation or analysis to support ending lost revenue recovery after four years regardless of measure life or evidence related to the financial effects of such a proposal on [Vectren South], CAC instead offer[ed] a conclusory opinion that the magnitude of lost revenues exceeds the program costs, which makes the proposal unreasonable" and "provided no factual basis to support its contention that lost revenues should not exceed program costs." *Id.* at 18. It further found that "[i]t is inherent to EM&V that validated energy savings will create lost revenues", and that "[c]onsequently, cost-effective EE programs should have lower programs [sic] costs with larger energy savings, which does result in higher lost revenues relative to program costs." *Id.*

[32] Based upon our review of the record, we conclude that there is substantial evidence to support the Commission's determination that Vectren South's Revised Lost Revenue Proposal is reasonable and that the Plan is reasonable and should be approved in its entirety. CAC's arguments to the contrary amount to an invitation to reweigh the evidence, we do not reweigh evidence or reassess witness credibility on appeal. *See U.S. Steel*, 907 N.E.2d at 1016.

[33] For the foregoing reasons, the Commission's Order on Remand is affirmed.

[34] Affirmed.

Najam, J., and Altice, J., concur.