**FILED**
Jun 27 2019, 4:11 pm
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court





I N  T H E

# Indiana Supreme Court

Supreme Court Case No. 18S-EX-475

## NIPSCO Industrial Group,
*Appellant (Intervenor below),*

–v–

## Northern Indiana Public Service Company,
*Appellee (Petitioner below),*

and

## Office of the Utility Consumer Counselor,
*Appellee (Statutory Party below).*

Argued: November 1, 2018 | Decided: June 27, 2019

Appeal from the Indiana Utility Regulatory Commission
No. 44733-TDSIC-2

On Petition to Transfer from the Indiana Court of Appeals
No. 93A02-1711-EX-2735

**Opinion by Justice Goff**

Chief Justice Rush and Justice Massa concur.

Justice Slaughter dissents with separate opinion in which Justice David joins.

**Goff, Justice.**

Everyone reaps a benefit when utilities are allowed to plan for investments in necessary and reasonable infrastructure projects. The "TDSIC Statute" at issue in this appeal promotes this beneficial behavior through a complex, integrated process that aims to protect all sides involved. On the utilities' side, the statute allows utilities to seek pre-approval from the Indiana Utility Regulatory Commission for certain electric or gas infrastructure projects and to recoup the costs of those projects through periodic petitions to the Commission for increases to its rates. On the consumers' side, the statute requires the Commission to make determinations regarding the public convenience, necessity, and reasonableness of planned projects before approving a plan to complete them. This process protects both suppliers and consumers of electric and gas services, improves the stability of the provision of these services, and increases the predictability of costs associated with providing and using these services.

Here, the process started off well but eventually broke down. The parties to this appeal agreed to two expansive, multi-year settlements regarding rates and infrastructure investments under the TDSIC Statute, and they asked the Commission to approve the agreements, which it did. These agreements specified how, in the utility's periodic petitions to the Commission, rate increases should be calculated and allocated among the utility's various rate classes. Despite being a party to the underlying agreements, a group of some of the utility's largest industrial customers opposed the utility's second periodic petition, arguing that the utility's rate calculation and allocation based on the underlying agreements was contrary to the TDSIC Statute. The Commission rejected this argument, and the customer group sought judicial review.

This case, at its core, involves a party to and proponent of two complex administrative settlement agreements raising a challenge to specific parts of those settlements in a later proceeding. Concluding that the customer group is estopped from raising this delayed challenge and further concluding that the Commission's order contains sufficient findings, we affirm the Commission.

# Factual and Procedural History

Given the lengthy and interwoven background of this appeal, our discussion of the factual and procedural history proceeds in three parts. We begin with a summary of some of the ways in which the Indiana Utility Regulatory Commission regulates utility rates and an overview of the specific challenge to the regulatory activity raised here. Then, we discuss two large-scale regulatory proceedings that provide the basis for the proceeding below. We conclude with a summary of the proceedings before the Commission and the Court of Appeals below.

## I. Regulation of utility rates generally and the specific challenge to the rate regulation here

Last year, in litigation between some of the same parties involved in this appeal, we discussed the general processes by which utility rates are set and adjusted. *See NIPSCO Indus. Grp. v. N. Ind. Pub. Serv. Co.* (*NIPSCO 2018*), 100 N.E.3d 234, 238–39 (Ind. 2018), *modified on reh'g*. We find a brief summary of these processes helpful in placing this appeal in the proper context.

Base utility rates are traditionally set or adjusted through a general ratemaking case (variously referred to as a general rate case or base rate case) before the Commission. This is a comprehensive process in which the Commission "examine[s] every aspect of the utility's operations and the economic environment in which the utility functions . . . ." *Id.* at 238 (quoting *U.S. Gypsum, Inc. v. Ind. Gas Co.*, 735 N.E.2d 790, 798 (Ind. 2000)). Such a detailed review allows the Commission to ensure that utility rates are fair to both the utility and its customers. *Id.*

In addition to the comprehensive process of a base rate case, utility rates can be adjusted to reflect specific projects and costs through a "tracker" or "rider" procedure before the Commission. The TDSIC Statute, at issue in this appeal, provides one such proceeding related to electric or gas **t**ransmission, **d**istribution, and **s**torage system **i**mprovement **c**harges a public utility imposes for certain improvement

projects. *See generally* Ind. Code ch. 8-1-39 (2016 Repl.).[1] This statute provides two distinct, yet related, types of proceedings. First, under Section 10, a utility can seek approval from the Commission of a multi-year plan "for eligible transmission, distribution, and storage improvements." I.C. § 8-1-39-10(a). *See also NIPSCO 2018*, 100 N.E.3d at 239. Second, under Section 9 and based on the multi-year plan, the utility can periodically petition the Commission for "adjustment of [its] basic rates and charges to provide for timely recovery of eighty percent (80%) of approved capital expenditures and TDSIC costs." I.C. § 8-1-39-9(a). *See also NIPSCO 2018*, 100 N.E.3d at 239. The utility calculates these rate adjustments through a multi-step process, and one of the steps in this process involves allocating eligible TDSIC costs among the utility's various rate classes.

One requirement of Section 9 of the TDSIC Statute speaks specifically to the allocation step of the rate adjustment calculation, and this requirement lies at the center of this appeal. A Section 9 petition, among other things, must "use the customer class revenue allocation factor based on firm load approved in the public utility's most recent retail base rate case order." I.C. § 8-1-39-9(a)(1). The parties agree as to which order from the Commission qualifies as Northern Indiana Public Service Company's ("NIPSCO")[2] most recent retail base rate case order. Further, the parties do not dispute the meaning of the term "firm load" in the context of this

---

[1] The legislature has recently amended the TDSIC Statute. *See* Pub. L. No. 89-2019, §§ 1–9, 2019 Ind. Acts ___. And our *NIPSCO 2018* decision analyzed some portions of the TDSIC Statute that have now been amended. *Compare, e.g.*, *NIPSCO 2018*, 242–43 (analyzing the word "designate" included in the then-applicable version of the TDSIC Statute) *with* Pub. L. No. 89-2019, §§ 1, 4, 2019 Ind. Acts ___ (removing the word "designate" from the TDSIC Statute). However, the recent amendments to the TDSIC Statute do not affect the continued validity of the analysis in *NIPSCO 2018* that we cite in this decision and do not impact the issues raised in this appeal.

[2] NIPSCO is a utility that provides gas and electric service to more than 800,000 customers.

proceeding.[3] However, the NIPSCO Industrial Group (the "Industrial Group")[4] argues that the customer class revenue allocation factors included in NIPSCO's second Section 9 petition were not based on firm load, as required by Section 9, but rather on total load.

## II. NIPSCO's most recent base rate case and its Section 10 proceeding for approval of its multi-year TDSIC plan

Because the Section 9 proceeding that spawned this appeal drew from the parties' settlements and the Commission's orders resolving NIPSCO's most recent base rate case and approving NIPSCO's multi-year TDSIC plan, we begin our discussion of the particular facts and history of this appeal with a discussion of the underlying proceedings.

### A. The base rate case

In October 2015, NIPSCO petitioned the Commission to begin a base rate case to increase its base electric service rates, and it submitted testimony and exhibits to the Commission.[5] Nine entities intervened and participated in the case, including the Industrial Group. The Indiana Office of Utility Consumer Counselor (the "OUCC"), a statutory representative of "ratepayers, consumers, and the public," I.C. § 8-1-1.1-4.1(a), also participated in the case.

---

[3] Although "firm load" is not defined for purposes of the TDSIC Statute, the parties referred to it as utility service provided with a high level of reliability. This contrasts with "non-firm load" or "interruptible load," which the parties treated as utility service that can be interrupted based on the needs of other utility customers and is thus less reliable. Total load, then, refers to the sum of firm and interruptible loads.

[4] The Industrial Group is a group consisting of some of NIPSCO's largest industrial customers.

[5] The case proceeded under Cause Number 44688 before the Commission.

In February 2016, NIPSCO, the OUCC, and most of the intervenors—including the Industrial Group—submitted a settlement agreement (the "Base Rate Case Settlement") to the Commission, along with supporting testimony. As relevant here, the settling parties stated, "For purposes of establishing any rate schedules allowing for the recovery of 80% of NIPSCO's approved capital TDSIC expenditures and costs pursuant to I.C. 8-1-39-9(a), the parties agree that Joint Exhibit D reflects the customer class revenue allocation factors that should be applied to firm load." Appellant's App. Vol. II, p. 223. Joint Exhibit D then provided allocation factor percentages for each of NIPSCO's electric rate classes.[6] *Id.* at 246.

On July 18, 2016, the Commission approved the Base Rate Case Settlement and entered an order generally in line with the settlement (the "Base Rate Case Order"). Specific to the issues raised in this appeal, the Commission "approve[d] the customer class revenue allocation factors shown in Joint Exhibit D" for use in subsequent TDSIC proceedings. *Id.* at 177. In coming to this conclusion, it noted that Joint Exhibit D to the Base Rate Case Settlement resolved a "significant issue [regarding] the allocation of costs recovered through [r]iders" and was "not opposed by any party." *Id.* at 154, 177.

## B. The TDSIC multi-year plan

In December 2015, while its base rate case was pending, NIPSCO petitioned the Commission for approval of a multi-year TDSIC plan pursuant to Section 10 of the TDSIC Statute. Five entities—one of which was the Industrial Group—intervened, and they, along with the OUCC, participated in the proceeding.

In March 2016, NIPSCO, the OUCC, and four of the five intervenors—including the Industrial Group—submitted a settlement agreement (the

---

[6] Joint Exhibit D provided two allocation factor percentages for each rate class to differentiate between costs specific to NIPSCO's transmission system and its distribution system. The parties on appeal do not challenge this method of allocating between transmission and distribution costs.

"TDSIC Plan Settlement") to the Commission, along with supporting testimony. The settling parties specified that "[t]he allocation factors for NIPSCO's TDSIC rider shall be those from NIPSCO's 2016 base rate case in Cause No. 44688." Appellant's App. Vol. III, p. 142. They further "agree[d] that using such factors complies with the TDSIC statute." *Id.* The agreement on the TDSIC allocation factors was so important to the settling parties that they expressly based their assent to the terms of the settlement on "the Commission's approval of the application of the allocation factors for TDSIC expenditures reflected in Joint Exhibit D to the [Base Rate Case] Settlement." *Id.* at 144.

On July 12, 2016, the Commission approved the TDSIC Plan Settlement and entered an order in accordance with the settlement (the "TDSIC Plan Order"). The Commission noted that, in "resolv[ing] a number of previously contested issues in a manner consistent with the TDSIC statute," the TDSIC Plan Settlement "provides clarity and predictability in a manner consistent with the public interest and administrative efficiency." *Id.* at 133. It further concluded that compromises as to the implementation of TDSIC allocation factors were "evident" and that these compromises were "consistent with the applicable statutory provisions and [were] reasonable and in the public interest." *Id.*

As discussed above, the Commission entered its Base Rate Case Order shortly after entering its TDSIC Plan Order. With these two orders entered, the parties to this appeal—NIPSCO, the Industrial Group, and the OUCC—and others had established a thorough, agreed-upon procedure under which NIPSCO would seek recovery of its TDSIC costs.

## III. NIPSCO's Section 9 petitions and this appeal

NIPSCO's first Section 9 petition was approved by the Commission in January 2017.[7] In this petition, NIPSCO conducted the multi-step calculation of its rate adjustments using, among other things, the customer

---

[7] We refer to this proceeding generally as TDSIC-1.

class revenue allocation factors contained in Joint Exhibit D to the Base Rate Case Settlement and approved in the Base Rate Case Order. Neither the Industrial Group nor the OUCC objected to this calculation.

NIPSCO filed its second Section 9 petition—the subject of this appeal—in June 2017.[8] In this petition, NIPSCO made some changes to its calculation and allocation from TDSIC-1, but, relevant here, it continued to use the same allocation factors from the Base Rate Case Settlement as it had used in TDSIC-1. Subject to a few suggested alterations to the petition not relevant to this appeal, the OUCC recommended that the Commission approve NIPSCO's TDSIC-2 petition.

The Industrial Group intervened in opposition to NIPSCO's TDSIC-2 petition. The Industrial Group argued that the customer class revenue allocation factors NIPSCO used in TDSIC-2 were not based on firm load as required by Section 9 of the TDSIC Statute but rather were based on total load. To correct the alleged deficiencies in TDSIC-2, the Industrial Group suggested that NIPSCO could follow the same calculation and allocation methodology it used in TDSIC-1 or it could revise the allocation factors.

The Commission rejected the Industrial Group's arguments and largely approved NIPSCO's TDSIC-2 petition. In its order, the Commission summarized testimony submitted by NIPSCO, the Industrial Group, and the OUCC, noting issues on which the parties' experts disagreed. It recited the requirement from Section 9 of the TDSIC Statute that "the Petition must use the customer class revenue allocation factor based on firm load approved in the public utility's most recent retail base rate case order." Appellant's App. Vol. II, p. 15 (citing I.C. § 8-1-39-9(a)(1)). It then stated, "Specific to the evidence of this proceeding, the Parties explicitly agreed to and the Commission approved the allocation factors established in the [Base] Rate Case Settlement and the [TDSIC Plan] Settlement. Those agreements leave no question as to what factors would be applied . . . ." *Id.* Thus, the Commission concluded that "NIPSCO is authorized to allocate transmission and distribution revenue requirements by using the

---

[8] We refer to this proceeding generally as TDSIC-2.

allocation percentages contained on Joint Exhibit D as previously approved in Cause No. 44688." *Id.* at 19.

The Industrial Group sought review of the Commission's TDSIC-2 order before the Court of Appeals[9] and raised two broad issues. In line with its contentions before the Commission, the Industrial Group primarily argued that the Commission's TDSIC-2 order allowed NIPSCO to use allocation factors based on total load contrary to the TDSIC Statute's requirement that the allocation factors be based on firm load. Additionally, the Industrial Group argued that the TDSIC-2 order lacked sufficient findings. In a joint appellees' brief, NIPSCO and the OUCC responded that the Industrial Group was estopped from challenging the terms of the underlying settlements, that the Commission's decision to approve the TDSIC-2 petition was owed strong deference, and that the TDSIC-2 order contained sufficient findings.

The Court of Appeals reversed the Commission. *NIPSCO Indus. Grp. v. N. Ind. Pub. Serv. Co.*, 104 N.E.3d 603 (Ind. Ct. App. 2018). It found that the customer class revenue allocation factors included in Joint Exhibit D to the Base Rate Case Settlement "were determined based on total load" despite the requirement that they be based on firm load. *Id.* at 610. Thus, it "conclude[d] that the Commission exceeded its statutory authority by allowing a rate adjustment based on allocation factors computed on total load." *Id.* at 611.

We granted the joint petition to transfer filed by NIPSCO and the OUCC, thereby vacating the Court of Appeals opinion. *See* Ind. Appellate Rule 58(A).

---

[9] Review of Commission final orders takes place in the Court of Appeals rather than a circuit or superior court. I.C. § 8-1-3-1; *Hamilton Se. Utils., Inc. v. Ind. Util. Regulatory Comm'n*, 101 N.E.3d 229, 232 (Ind. 2018).

# Standard of Review

Indiana Code section 8-1-3-1 supplies the basis for our review of the Commission's TDSIC-2 order. *See N. Ind. Pub. Serv. Co. v. U.S. Steel Corp.* (*U.S. Steel*), 907 N.E.2d 1012, 1015 (Ind. 2009) (citing I.C. § 8-1-3-1 (2008)). It provides:

> An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

I.C. § 8-1-3-1 (2018). When presented with an appeal under this section, we apply three levels of review: "one for factual findings; another for mixed questions of law and fact; and a third for questions of law." *NIPSCO 2018*, 100 N.E.3d at 241. *See also U.S. Steel*, 907 N.E.2d at 1015–18 (describing the levels of review). The Industrial Group's arguments addressed below involve only the second level of review.

Appeals involving claims of insufficient findings to sustain the ultimate conclusions contained in the order present questions of ultimate fact—or mixed questions of law and fact. *See Ind. Gas Co. v. Ind. Fin. Auth.*, 999 N.E.2d 63, 66 (Ind. 2013). In these cases, we review the Commission's conclusions for reasonableness, deferring to the Commission "based on the amount of expertise exercised by [it]." *U.S. Steel*, 907 N.E.2d at 1016 (citation omitted). Thus, we give more deference to orders on subjects within the Commission's expertise and less deference to orders dealing with matters outside its expertise. *Id.* "In either case, courts may examine the logic of inferences drawn and any rule of law that may drive the result." *Id.*

# Discussion and Decision

The TDSIC Statute "encourages energy utilities to replace their aging infrastructure by modernizing electric or gas transmission, distribution, and storage" systems. *NIPSCO 2018*, 100 N.E.3d at 238. Presumably understanding that these modernization projects require significant investments of time and money, the legislature drafted the TDSIC Statute to allow utilities to first petition the Commission for approval of a multi-year TDSIC plan and then petition the Commission for periodic rate adjustments based on its progress. *See generally* I.C. §§ 8-1-39-9, -10 (2016). This complex, long-term process allows for some stability and predictability on both sides of the utility transaction: utilities can count on recouping their investment in upgraded infrastructure, and individuals and businesses in Indiana can count on the efficient and reliable provision of much-needed gas and electric services.

The primary issue in this appeal is whether the Commission improperly approved of the use of customer class revenue allocation factors based on total load rather than firm load as required by the TDSIC Statute. *See* I.C. § 8-1-39-9(a)(1) (requiring that Section 9 petitions "use the customer class revenue allocation factor based on firm load approved in the public utility's most recent retail base rate case order"). The Industrial Group also presents us with a secondary argument challenging whether the Commission's TDSIC-2 order contained specific findings supporting its ultimate conclusion in approving the TDSIC-2 petition. We address both issues in turn below.

# I. The Industrial Group's primary argument against the TDSIC-2 order is, in reality, an attack on the underlying settlements and orders, and the Industrial Group is estopped from bringing this challenge now.

## A. The Industrial Group's argument challenges the customer class revenue allocation factors contained in the Base Rate Case Settlement rather than any unique feature of the TDSIC-2 order.

The Industrial Group's principal argument, weaved throughout its briefing, is that Section 9 of the TDSIC Statute requires customer class revenue allocation factors to be based on firm load, but the allocation factors here were based on total load instead. Resp. in Opposition to Transfer, pp. 8–9; *see also id.* at 8, 10, 12, 17 (referring to the alleged statutory violation in every top-level heading of the argument); Br. of Appellant NIPSCO Industrial Group, p. 18 (beginning its summary of the argument by describing the alleged statutory violation). The Industrial Group frames this argument in terms of only the TDSIC-2 order, but it is not based on any unique feature of the order. The TDSIC-2 order merely pointed NIPSCO to the allocation factors in the Base Rate Case Settlement for use in this and future Section 9 petitions. Appellant's App. Vol. II, p. 19. This instruction follows the overall TDSIC procedure—agreed to in the TDSIC Plan Settlement and approved in the TDSIC Plan Order—that Section 9 petitions would use the allocation factors from the Base Rate Case Settlement. Appellant's App. Vol. III, p. 131 (directing in the order that "[t]he allocation factors to be used in NIPSCO TDSIC tracker filings will be those from Cause No. 44688"); *id.* at 142 (agreeing in the settlement that "[t]he allocation factors for NIPSCO's TDSIC rider shall be those from NIPSCO's 2016 base rate case in Cause No. 44688"). Indeed, the Industrial Group's witness testified that NIPSCO relied on the allocation factors from Joint Exhibit D to the Base Rate Case Settlement in both TDSIC-1 and TDSIC-2. Non-Conf. Ex. Vol. 2, pp. 185–86. Thus, while the Industrial

Group frames its argument as challenging the Commission's approval of the TDSIC-2 petition, the substance of its argument centers on the allocation factors contained in Joint Exhibit D to the Base Rate Case Settlement, approved in the Base Rate Case Order, and referenced in the TDSIC Plan Settlement and TDSIC Plan Order. As a result, we will consider this argument for what it really is: a challenge to the terms of the Base Rate Case Settlement and the related order.

When the Industrial Group's arguments are viewed in the proper context of coming from a challenger that was a party to—and, before the Commission, an advocate of—settlements of both a base rate case and a petition for approval of a multi-year TDSIC plan, NIPSCO and the OUCC's estoppel argument becomes more compelling. *See* Br. of Appellees NIPSCO and OUCC, pp. 22–23 (raising estoppel as a bar to the Industrial Group's challenge).

## B. The Industrial Group is estopped from challenging the terms of the Base Rate Case Settlement.

In a general sense, estoppel forces a party to follow through on what it says or otherwise represents it will do. More specifically, we have said it "is a concept by which one's own acts or conduct prevents the claiming of a right to the detriment of another party who was entitled to and did rely on the conduct." *Ashby v. Bar Plan Mut. Ins. Co.*, 949 N.E.2d 307, 313 (Ind. 2011) (quoting *Brown v. Branch*, 758 N.E.2d 48, 51–52 (Ind. 2001)). *See also Estoppel*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining estoppel as "[a] bar that prevents one from asserting a claim or right that contradicts what one has said or done before . . ."). It is based on principles of equity and "aid[s] the law in the administration of justice where, without its aid, injustice might result." *First Nat'l Bank of Logansport v. Logan Mfg. Co.*, 577 N.E.2d 949, 954 (Ind. 1991). While estoppel comes in many different forms, all its forms "are based on the same underlying principle: one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other." *Brown*, 758 N.E.2d at 52. With these foundational principles

of estoppel guiding our analysis, we conclude that the Industrial Group is estopped from challenging the use of the customer class revenue allocation factors from the Base Rate Case Settlement and related order at this time.

In both the base rate case and the TDSIC multi-year plan proceeding, the Industrial Group supported the use of the allocation factors from the Base Rate Case Settlement and related order—a position NIPSCO relied on in later TDSIC proceedings. Not only did the Industrial Group join the Base Rate Case Settlement that provides the allocation factors it now challenges but it also offered testimony before the Commission in support of the settlement. *See* Non-Conf. Ex. Vol. 4, p. 7 (characterizing, in its witness's testimony, the settlement as a "comprehensive agreement that resolve[d] both revenue and the complex allocation and rate mitigation issues in this rate case"). Specifically regarding the allocation factors, the Industrial Group's witness testified that they "provide a comprehensive method for allocating NIPSCO's base rates as well as tracked expenses, which is reasonable and in the public interest." *Id.* at 11. Later, the Industrial Group doubled down on its support for the allocation factors included in the Base Rate Case Settlement when it joined in the TDSIC Plan Settlement that was "expressly predicated upon . . . the Commission's approval of the application of the allocation factors for TDSIC expenditures reflected in Joint Exhibit D to the [Base Rate Case] Settlement . . . ." Appellant's App. Vol. III, p. 144. Relying on these agreements fully supported by the Industrial Group, NIPSCO began filing periodic rate adjustment petitions pursuant to Section 9 of the TDSIC Statute. When NIPSCO filed its TDSIC-1 petition that used the allocation factors from the Base Rate Case Settlement, the Industrial Group did not object. Only when NIPSCO filed its TDSIC-2 petition—which used the same allocation factors as the TDSIC-1 petition used and as the TDSIC Plan Settlement and the Base Rate Case Settlement provided—did the Industrial Group object. Thus, up until TDSIC-2, the Industrial Group approved using the allocation factors from the Base Rate Case Settlement, and NIPSCO relied on that approval in moving forward with its TDSIC multi-year plan.

Allowing the Industrial Group to reverse course now and object to the use of the allocation factors at this late stage would harm NIPSCO and the broader utility regulatory and infrastructure systems involved in this case. The TDSIC Statute contemplates many related proceedings over the course of several years with an underlying base rate case and a TDSIC multi-year plan providing the foundation for periodic rate adjustment petitions. The Industrial Group's argument challenging the allocation factors provided in the underlying Base Rate Case Settlement seeks to undermine the foundation on which the later TDSIC proceedings have been built. With the Base Rate Case Settlement in question, NIPSCO—not to mention the other parties to the Base Rate Case Settlement and the TDSIC Plan Settlement—would then need to spend considerable resources adjusting the plans laid out in the settlements, striking entirely new settlement agreements, or proceeding with contested cases before the Commission. And, in light of the equitable underpinnings of the estoppel doctrine, we cannot lose sight of the fact that the injury would spread beyond NIPSCO. The OUCC, a statutory representative of "ratepayers, consumers, and the public," I.C. § 8-1-1.1-4.1(a) (2016 Repl.), has joined NIPSCO in opposing the Industrial Group's appeal. Allowing the Industrial Group's delayed attacks against the Base Rate Case Settlement would risk disrupting the public's interest in stable and modern electric and gas transmission, distribution, and storage infrastructure systems by hindering long-approved efforts at modernization. Further, permitting these tardy attacks would reduce parties' and the public's confidence in the durability of long-term regulatory settlements and orders. In light of the long-term, integrated procedures contemplated by the TDSIC Statute, allowing the Industrial Group to belatedly challenge the underlying settlement in NIPSCO's base rate case would harm NIPSCO and the broader systems involved in utility regulation and supply.

Because the Industrial Group's support for the Base Rate Case Settlement induced NIPSCO to rely on that settlement and the related order in subsequent TDSIC proceedings and because allowing the Industrial Group to change its position and raise this challenge would injure NIPSCO, the Industrial Group is estopped from challenging the use of the customer class revenue allocation factors now. This conclusion is in

line with the "general proposition" laid out by the Supreme Court of the United States long ago that, if a party takes "a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis v. Wakelee*, 156 U.S. 680, 689 (1895). It is also in line with prior decisions of this Court in which we rejected parties' attempts to change course from earlier positions taken. *See, e.g.*, *Speckman v. City of Indianapolis*, 540 N.E.2d 1189, 1191 (Ind. 1989) (finding the city was estopped from arguing that a contract was not binding on it when the contract stipulated that the city's counsel had reviewed the contract and found it to be proper); *United States v. Fletcher Sav. & Tr. Co.*, 197 Ind. 527, 537–38, 151 N.E. 420, 423 (1926) (rejecting an argument by the United States that a prior payment did not strictly comply with a contract when the United States had previously concluded that the contract was not a valid contract). The Industrial Group's delay in challenging the allocation factors contained in the Base Rate Case Settlement and related order understandably caused NIPSCO to rely on the Industrial Group's support for those allocation factors in later TDSIC proceedings, and allowing this delayed challenge now would harm NIPSCO and the larger systems used to regulate utilities and to provide utility service to the public. As a result, the Industrial Group is estopped from now challenging NIPSCO's use of the allocation factors.

## II. The Commission's TDSIC-2 order contains specific findings supporting its conclusion.

The Industrial Group also argues that the TDSIC-2 order lacks specific findings supporting the Commission's ultimate conclusions. Br. of Appellant, p. 36 (citing *L.S. Ayers & Co. v. Indianapolis Power & Light Co.*, 169 Ind. App. 652, 662, 351 N.E.2d 814, 822 (1976)). In issuing its orders, the Commission must include "specific findings on all the factual determinations material to its ultimate conclusions." *U.S. Steel*, 907 N.E.2d at 1016. An appeal based on an alleged lack of specific findings presents a mixed question of law and fact. *Ind. Fin. Auth.*, 999 N.E.2d at 66. In these

situations, we review the Commission's conclusions for reasonableness, deferring to the Commission "based on the amount of expertise exercised by [it]." *U.S. Steel*, 907 N.E.2d at 1016 (citation omitted).

In line with our analysis above, the Commission recognized that the Industrial Group's challenge centered on the Base Rate Case Settlement and the TDSIC Plan Settlement, along with their related orders. *See* Appellant's App. Vol. II, pp. 13, 15 (discussing the settlements and orders). "Approving such [settlements] and resolving disputes revolving around them [are] intrinsic to the Commission's regulation of utility rates." *U.S. Steel*, 907 N.E.2d at 1018. And, in resolving disputes over settlement agreements it has previously approved, the Commission deploys its expertise of both the terms of the settlement and the regulation of utility rates. *Id.* at 1017–18. Thus, in reviewing the Industrial Group's challenge to the sufficiency of the Commission's findings involving a previously-approved settlement concerning utility rate regulation, we give the Commission greater deference.

Despite the Industrial Group's arguments to the contrary, the Commission supported its conclusion to approve the TDSIC-2 petition with specific findings. The Commission began its discussion of the allocation factors by summarizing the conflicting testimony presented to it in TDSIC-2 by NIPSCO and the Industrial Group. Appellant's App. Vol. II, p. 13. It noted that the allocation factors in NIPSCO's TDSIC-2 petition came from the Base Rate Case Settlement and were approved in the Base Rate Case Order. *Id.* It also noted that the parties to the TDSIC Plan Settlement provided that the allocation factors from the Base Rate Case Settlement should be used in TDSIC proceedings based on the multi-year TDSIC plan, and they "agree[d] that using such factors complies with the TDSIC Statute." *Id.* (citation omitted). Based on these findings, the Commission concluded, "Specific to the evidence of this proceeding, the [p]arties explicitly agreed to and the Commission approved the allocation factors established in the [Base] Rate Case Settlement and the [TDSIC Plan] Settlement. Those agreements leave no question as to what factors would be applied . . . ." *Id.* at 15. In light of the findings in this case and the Commission's expertise in this area, the Commission's conclusion was reasonable and properly supported by specific findings.

# Conclusion

For these reasons, we affirm the order of the Commission.

Rush, C.J., and Massa, J., concur.
Slaughter, J., dissents with separate opinion in which David, J., joins.

ATTORNEYS FOR APPELLANT
Todd A. Richardson
Bette J. Dodd
Joseph P. Rompala
Lewis & Kappes, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE NORTHERN INDIANA PUBLIC
SERVICE COMPANY
Brian J. Paul
Daniel E. Pulliam
Faegre Baker Daniels LLP
Indianapolis, Indiana

Claudia J. Earls
M. Bryan Little
NiSource Corporate Services – Legal
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE OFFICE OF THE UTILITY
CONSUMER COUNSELOR
Jeffrey M. Reed
William I. Fine
Randall C. Helmen
Tiffany T. Murray
Office of the Utility Consumer Counselor
Indianapolis, Indiana

**Slaughter, J., dissenting.**

I respectfully dissent, believing that this case concerns an issue of law the court of appeals decided correctly, and not a matter of regulatory discretion warranting agency deference. On the merits, I agree with the court of appeals that the utility regulatory commission exceeded its statutory authority by approving a rate adjustment based on allocation factors computed on total load rather than firm load. I would either deny transfer or summarily affirm the court of appeals' opinion.

David, J., joins.