

FILED

Nov 04 2020, 8:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

*Citizens Action Coalition of Indiana, Inc.*

Jennifer A. Washburn
Indianapolis, Indiana

*City of Indianapolis*

Anne E. Becker
Bette Jean Dodd
Indianapolis, Indiana

*Indiana Office of Utility Consumer Counselor*

Abby R. Gray
William I. Fine
Randall C. Helmen
Jeffrey M. Reed
Indianapolis, Indiana

*IPL Industrial Group*

Todd A. Richardson
Joseph P. Rompala
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

*Indiana Utility Regulatory Commission*

Aaron T. Craft
Jeremy R. Comeau
Steven L. Davies
Beth E. Heline
Indianapolis, Indiana

*Indianapolis Power and Light Company*

Peter J. Rusthoven
Teresa E. Morton
Jeffrey M. Peabody
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IPL Industrial Group, Citizens Action Coalition of Indiana, Inc., City of Indianapolis, and Indiana Office of Utility Consumer Counselor, | November 4, 2020 |
| | Court of Appeals Case No. 20A-EX-800 |
| *Appellants-Intervenors,* | Appeal from the Indiana Utility Regulatory Commission |
| v. | The Honorable Jennifer L. Schuster, Administrative Law Judge |
| Indianapolis Power and Light Company and Indiana Utility Regulatory Commission, | The Honorable James F. Huston, Chairman |
| | IURC Cause No. 45264 |
| *Appellees-Petitioners.* | |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellants-Intervenors and Statutory Party, IPL Industrial Group, Indiana Office of Utility Consumer Counselor, City of Indianapolis, and Citizens Action Coalition of Indiana, Inc. (Collectively, Consumer Parties), appeal the Indiana Utility Regulatory Commission's (Commission) Order approving Appellee-Petitioner's, Indianapolis Power & Light Company (IPL), Proposed Plan involving $1.2 billion in system investments over a seven-year period.

We affirm.

## ISSUES

The Consumer Parties raise three issues on appeal, which we restate as follows:

1. Whether the Commission's decision to admit into evidence IPL's workpapers was an abuse of discretion, when the admission occurred at the end of the evidentiary hearing and without a sponsoring witness or foundation;

2. Whether the Commission erroneously interpreted the statutory requirement that the incremental benefits yielded by the Proposed Plan must justify its estimated costs when IPL's evidence established that its Proposed Plan was geared towards risk reduction of an already highly reliable system; and

3. Whether the Commission failed to make specific findings on material issues and only formulated a conclusory finding in summary fashion on the statutory cost-justification requirement and the disputed monetization analysis offered by IPL.

## FACTS AND PROCEDURAL HISTORY

The case before us arises under the Transmission, Distribution, and Storage System Improvement Charge (TDSIC) statute, as enacted in Indiana Code Ch. 8-1-39. Unlike a traditional rate case which involves a comprehensive review of a utility's operations and financial status, the TDSIC mechanism allows utilities to request increases in their rates—outside of a rate case—to fund certain

upgrades and improvements to an energy utility's transmission, distribution, or storage system in Indiana. The TDSIC statute institutes two distinct types of proceedings. First, pursuant to Section 10, the utility must secure the Commission's preapproval of a plan to complete identified improvement projects at a defined budget over a specified time period. *See* I.C. § 8-1-39-10. To gain approval, the plan must satisfy certain enumerated statutory criteria, including the best estimate of costs, a finding of public convenience and necessity, a showing of reasonableness, and a determination that "the estimated costs of the eligible improvements included in the plan are justified by incremental benefits attributable to the plan." *See* I.C. § 8-1-39-10(b). Once a plan is approved, the utility may then, pursuant to Section 9, seek periodic rate increases at six-month intervals to recover 80% of the approved costs as the planned work is completed. *See* I.C. § 8-1-39-9(a). Up to these authorized expenditures, rate recovery is automatic. The remaining 20% of the costs is accumulated in a deferred account for recovery, with carrying charges, in the utility's next rate case. *See* I.C. § 8-1-39-9(c).

[5] On July 24, 2019, IPL filed its petition with the Commission under Section 10 of the TDSIC statute, seeking approval of proposed expenditures of $1.2 billion over a seven-year period to replace, rebuild, upgrade, redesign, and modernize a wide range of IPL's transmission- and distribution-system assets (Proposed Plan). The Proposed Plan was intended to address grid resiliency, so that the system could be restored more easily when outages occur. The investments under the Proposed Plan were prioritized through a Risk Model, which

identified assets based on the amount of risk—in terms of likelihood of failure and consequence of failure—and the cost to buy down risk in order to achieve the highest risk reduction per dollar invested. IPL projected that the planned projects would result in a system risk reduction of about 36.6% over the seven-year period. To justify the enormous cost of the Proposed Plan, IPL relied on a monetization analysis. Using a Department of Energy calculation tool, IPL monetized the impact of projected outages over a twenty-year period, which IPL asserted could be avoided through the planned projects enumerated in the Proposed Plan. According to IPL, the monetization analysis reflects a net benefit of $939 million to IPL customers by the end of the twenty-year period.

[6] At the same time IPL filed its petition, it also prefiled, pursuant to Commission procedure, its case-in-chief evidence consisting of the written testimony and related exhibits of six witnesses. IPL also submitted voluminous workpapers consisting of underlying supporting material associated with the witnesses' testimony.

[7] By statute, the ratepaying public is represented in all utility proceedings by the Office of Utility Consumer Counselor (OUCC), an independent state agency. In addition, three other Consumer Parties intervened in this proceeding. The IPL Industrial Group (Industrial Group) is an ad hoc group comprised of several large volume consumers served by IPL; the City of Indianapolis intervened in its capacity as an IPL ratepayer with an interest in the impact of IPL rates on the local economy and its citizenry; and Citizens Action Coalition and Environmental Law & Policy Center are advocacy organizations for

consumer and environmental interests that were jointly represented below. All of the Consumer Parties opposed IPL's petition for approval of the Proposed Plan and prefiled their written testimony and exhibits in response. On October 23, 2019, IPL filed its rebuttal evidence but did not file any additional workpapers in connection with the rebuttal evidence.

[8] Over the course of three days—November 14, 21, and 22, 2019—the Commission conducted a publicly noticed evidentiary hearing. On the third and final day of the proceeding, after the penultimate IPL witness had testified and both cross-examination and redirect were completed, IPL's counsel orally moved the Commission to take administrative notice of the voluminous workpapers that had been submitted by IPL at the outset of the proceeding. The workpapers had not been offered as exhibits in connection with the testimony of any IPL witness at the hearing. The witness who testified subsequently addressed accounting issues that were unrelated to nearly all of the mass of workpapers, and the witness did not identify, authenticate, or reference the workpapers during his testimony. The Consumer Parties objected to IPL's request for administrative notice of the workpapers as being untimely and not sponsored by any witness. They also asserted that IPL should have included the workpapers in its prefiled evidence if it wanted them to be part of the evidentiary record. The Commission took the issue under advisement.

[9] On March 4, 2020, The Commission issued its Order, in which it addressed the statutory criteria under Section 10 of the TDSIC Statute, determining that the estimated costs of the projects in IPL's Proposed Plan were justified by their

incremental benefits, and approved the Plan as proposed by IPL in its entirety. As part of the Order, the Commission granted IPL's request for administrative notice of its workpapers.

The Consumer Parties appealed. Additional facts will be provided if necessary.

# DECISION AND DISCUSSION

### I. *Standard of Review*

The General Assembly created the Commission primarily as a fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature. *Northern Ind. Publ. Service Co. v. United States Steel Co.*, 907 N.E.2d 1012, 1015 (Ind. 2009). The Commission's assignment is to ensure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana. *Ind. Bell Tel. Co. v. Ind. Util. Regulatory Comm'n,* 715 N.E.2d 351, 354 n.3 (Ind. 1999). The Commission can only exercise power conferred upon it by statute. *Northern Ind. Publ. Service Co.*, 907 N.E.2d at 1015. An appeal of the Commission's decision amounts to a two-tiered review by the appellate court. On the first level, it requires a review of whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. *Citizens Action Coalition of Ind., Inc. v. N. Ind. Pub. Serv. Co.,* 485 N.E.2d 610, 612 (Ind. 1985). Such determinations of basic fact are reviewed under a substantial evidence standard, meaning the order will stand unless no substantial evidence supports it. *McClain v. Review Bd. of Ind. Dept. of Workforce Dev.,* 693 N.E.2d 1314, 1317-18 (Ind. 1998).

During its substantial evidence review, "the appellate court neither reweighs the evidence nor assesses the credibility of witnesses and considers only the evidence most favorable to the [Commission's] findings." *Id.* The Commission's order is conclusive and binding unless (1) the evidence on which the Commission based its findings was devoid of probative value; (2) the quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a rational basis; (3) the result of the hearing before the Commission was substantially influenced by improper considerations; (4) there was no substantial evidence supporting the findings of the Commission; (5) the order of the Commission is fraudulent, unreasonable, or arbitrary. *Id.* at 1317 n.2. This list of exceptions is not exclusive. *Id.* At the second level, the order must contain specific findings on all the factual determinations material to its ultimate conclusions. *Citizens Action Coalition*, 485 N.E.2d at 612. We review the Commission's conclusions of ultimate facts for reasonableness, the deference of which is based on the amount of expertise exercised by the agency. *McClain*, 693 N.E.2d at 1317-18.

Insofar as the order involves a subject within the Commission's special competence, the courts should give greater deference. *Id.* at 1318. Conversely, if the subject is outside the Commission's expertise, the courts should give less deference. *Id.* In either case, courts may examine the logic of inferences drawn and any rule of law that may drive the result. *Id.* Additionally, an agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its

jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order. *Citizens Action Coalition*, 485 N.E.2d at 612-13.

"Ratemaking is a legislative, not a judicial function[.]" *Pub. Serv. Comm'n v. City of Indianapolis*, 131 N.E.2d 308, 312 (Ind, 1956). Agencies are executive branch institutions which the General Assembly has empowered with delegated duties. *Northern Ind. Publ. Service Co.*, 907 N.E.2d at 1018. As such, "basic facts are reviewed for substantial evidence, legal propositions are reviewed for their correctness." *McClain*, 693 N.E. 2d at 1318. Ultimate facts or "mixed questions" are evaluated for reasonableness, with the amount of deference depending on whether the issue falls within the Commission's expertise. *See id*.

## II. *Admission of Workpapers*

The Consumer Parties contend that the admission of nearly 20,000 pages of workpapers was highly prejudicial and unfair because the documents related to key elements on which IPL bore the burden of proof and IPL did not introduce them into evidence until after the Consumer Parties had rested their case. Although the Commission admitted the workpapers by administrative notice, the Consumer Parties maintain that administrative notice was improper because no foundation was laid, there was no sponsoring witness, and the documents were not verified or self-authenticating.

Formal Commission proceedings are conducted through an adversarial process, in which "the Commission may be guided generally by relevant provisions of

the Indiana Rules of Trial Procedure and the Indiana Rules of Evidence to the extent they are consistent with this rule," while some features of the process utilize agency specific rules and practices. *See* 170 Admin. Code § 1-1.1-26(a). When IPL filed its petition with the Commission, it also prefiled its case-in-chief evidence consisting of the written testimony and exhibits of six witnesses. Pursuant to the Commission's prehearing conference order, IPL filed "copies of the workpapers used to produce that evidence within two business days after the prefiling of the technical evidence," with service on the Consumer Parties. (Appellant's App. Vol. II, p. 111). As such, the workpapers represent "support for the technical evidence and calculations included in a party's case-in-chief." (Appellant's App. Vol. II, p. 35). They provide detailed computational and comparable backup for the technical evidence in a proceeding and allow the Commission's expert staff to review in detail the analyses that further support IPL's evidence.

[17] On the third and final day of the proceeding, after the penultimate IPL witness testified and both cross-examination and redirect were completed, IPL's counsel orally moved the Commission to take administrative notice of the workpapers that had been submitted by IPL at the outset of the proceeding. The Consumer Parties contend that this request was untimely and made in violation of Indiana's Administrative rule, which states that, "[a] request by a party for administrative notice of a factual matter that should be included in a party's prefiled testimony shall be made at the same time the related evidence is

prefiled." 170 I.A.C. 1-1.1-21(j).[1] However, as workpapers merely provide further underlying support for the calculations and details of the factual matters addressed by a witness' prefiled testimony, they do not constitute facts that are required to be in testimony.[2]

[18] Rather, IPL's administrative notice request was made pursuant to 170 I.A.C. 1-1.1-21(h), which provides that the "Commission may take administrative notice, on its own motion or upon a party's motion, of relevant administrative rules, commission orders, or other documents previously filed with the Commission." As IPL submitted the workpapers on July 24, 2019 to the Commission, and served them on the Consumer Parties at the same time, they amount to "other documents previously filed," of which the Commission may properly take administrative notice.

[19] We disagree with the Consumer Parties that the workpapers are inadmissible as they were admitted without a proper foundation or a sponsoring witness, in violation of Indiana's rules of evidence. While we agree that Indiana's rules of evidence are applicable to the Commission's proceedings, their application is limited "to the extent they are consistent with" the rules promulgated in the Administrative Code. *See* 170 I.A.C. § 1-1.1-26(a). As specific rules governing

---

[1] The Commission's procedural rules were amended and became effective June 10, 2020. Here, the Commission applied the rules in effect at the time of the proceeding, prior to the new rules taking effect.

[2] Even if we find, which we do not, that the workpapers fall within the premise of 170 I.A.C. 1-1.1-21(j) and comport a factual matter that should be included in a party's prefiled testimony, we conclude that IPL's untimely request for administrative notice merely amounted to harmless error as the Consumer Parties had received notice and a copy of the workpapers three months before the hearing.

administrative notice before the Commission were promulgated, the administrative rules trump the evidentiary trial rules. Accordingly, the Commission appropriately took administrative notice of IPL's workpapers

### III. *Incremental Benefits*

In Indiana, utility rates are traditionally adjusted through general ratemaking cases, which encompass a "comprehensive" process, requiring the Commission to "examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data [the Commission] has received is representative of operating conditions that will, or should, prevail in future years." *United States Gypsum, Inc. v. Ind. Gas Co.*, 735 N.E.2d 790, 798 (Ind. 2000). However, over the years the legislature has supplemented traditional ratemaking with various 'tracker" procedures that allow utilities to ask the Commission to adjust their rates to reflect various costs without having to undergo a full ratemaking case. *NIPSCO Indus. Grp. v. N. Ind. Publ. Serv. Co.*, 100 N.E.3d 234, 238 (Ind. 2018). The TDSIC statute is one such procedure; it encourages energy utilities to replace their aging infrastructure by modernizing electric or gas transmission, distribution, and storage projects. *Id*. This TDSIC procedure is a process for utilities to assess a distinct charge—a Transmission, Distribution, and Storage System Improvement Charge—for completed projects deemed eligible for improvements under the Statute. *Id*. In contrast to traditional ratemaking, the TDSIC procedure permits a utility to seek preapproval of designated capital improvements to the utility's infrastructure and then to recover the costs of those improvements every few

months as they are completed. *Id.* at 238-39. Eligible improvements are certain new or replacement utility projects that: "(1) a public utility undertakes for purposes of safety, reliability, system modernization, or economic development . . .; (2) were not included in the public utility's rate base in its most recent general rate case; and (3) [were] designated in the public utility's seven year plan and approved by the Commission under section 10 of this chapter as eligible for TDSIC treatment." I.C. § 8-1-39-2.

[21] The TDSIC statute contemplates two distinct types of proceedings, only one of which is at the center of this dispute. Specifically, under Section 10, the utility may seek regulatory approval of a seven-year plan for designated improvements to transmission, distribution, and storage systems. *See* I.C. § 8-1-39-10. The Commission shall then approve the plan and designate the planned improvements as eligible for TDSIC treatment if it finds the plan is reasonable. I.C. § 8-1-39-10(b). When determining that a plan is reasonable, the Commission's order must include (1) "[a] finding if the best estimate of the cost of the eligible improvements," (2) "[a] determination whether public convenience and necessity require or will require the eligible improvements," and (3) "[a] determination whether the estimated costs of the eligible improvements . . . are justified by the incremental benefits attributable to the

plan." I.C. § 8-1-39-10(b).[3] It is this third determination that takes center stage in the Consumer Parties' pivotal argument.

[22] Focusing on the incremental benefits language in the determination of the reasonableness of the Proposed Plan, the Consumer Parties contend that IPL did not identify any cost-justified incremental benefits of the suggested improvements, but instead relied on "a risk reduction rationale, premised on the theory that a percentage reduction in risk, no matter how small that risk may be, is sufficient justification for the enormous $1.2 billion investment proposed." (Appellants' Br. p. 25). They argue that IPL's theory significantly altered the analysis as the record reflects a highly reliable utility system with a consistent history of strong performance and a recent approval of its rate funding plan to target the leading cause of outages. Because IPL has consistently achieved a high level of reliability as compared to investor-owned utilities nationwide, the Consumer Parties maintain that a shift from assessing incremental benefits as required by statute to considering only reductions to an already low level of risk, does not satisfy the cost-justification of the excessive costs to achieve a negligible change in system performance.

---

[3] The second type of proceeding—which is not disputed—is comprised in Section 9 and states that once the Commission has approved a seven-year plan, the utility may petition every few months for periodic rate adjustments to recover "eight percent (80%) of approved capital expenditures and TDSIC costs" for the system improvements designated as eligible and actually completed. I.C. §§ 8-1-39—9(a), (c), (e). The remaining twenty percent can be recovered only "as part of the next general rate case that the public utility files with the Commission." I.C. § 8-1-39-9(b).

[23]     In essence, the Consumer Parties' argument rests on the premise that an incremental benefit may only be measured by an overall increase in the current reliability of IPL's system. Put differently, the Consumer Parties posit that if a utility's system is 99% reliable, a TDSIC plan will satisfy the statutory incremental benefits requirement only if it will further elevate the overall system's reliability. Under their reading, the fact a TDSIC plan will preserve system reliability going forward, when it would otherwise degrade, is immaterial. Nothing in the TDSIC statute supports the Consumer Parties' narrow reading of incremental benefits.

[24]     The TDSIC statute "encourages energy utilities to replace their aging infrastructure by modernizing electric or gas transmissions, distributions, and storage systems." *NIPSCO Indus. Grp. v. N. Ind. Pub. Serv. Co.*, 125 N.E.3d 617, 624 (Ind. 2019). At its core, the TDSIC statute approves designated capital improvements to the utility's infrastructure to replace its aging infrastructure and modernize its system. A proposed upgrade to the system is thus reasonable when "the estimated costs of the eligible improvements . . . are justified by the incremental benefits attributable to the plan." I.C. § 8-1-39-10(b). Once the Commission identifies the incremental benefits, it must then exercise its quasi-legislative function and determine whether these benefits justify the estimated costs.

[25]     Neither 'benefit' nor 'incremental' is defined by the TDSIC statute. "When interpreting a statute, we presume the legislature uses undefined terms in their common and ordinary meaning." *NIPSCO Indus. Grp.*, 100 N.E.3d at 242. "If

the legislature has not defined a word, we give the word its plain, ordinary, and usual meaning, consulting English language dictionaries when helpful in determining that meaning." *Moriarty v. Ind. Dep't of Nat. Res.*, 113 N.E.3d 614, 621 (Ind. 2019). As such, a "benefit" is defined as "something that guards, aids, or promotes well-being;" while "incremental" means "something that is gained or added." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 204, 1146 (3rd ed. 1993).

[26] The evidence reflects that the Proposed Plan identified seven categories of benefits: (1) customer experience; (2) reliability and resiliency; (3) safety; (4) operational efficiency; (5) risk reduction; (6) power quality; and (7) modernization. Some of these benefits are reduced to a quantifiable monetary value or monetization and each of the projects in the Proposed Plan are correlated with several types of associated benefits. Among others, the Proposed Plan indicates that the rebuilding of circuits, the largest category of projects in terms of estimated costs, would involve rebuilding more than 400 miles of overhead power lines. It is uncontested that an upgrade to those lines would make IPL's system safer to the public and more reliable, while also improving the ability to restore power promptly in the event of an outage. The Plan reflects that the circuit rebuilds will lead to a larger capacity for bi-directional flow, which will allow for more customer-owned generation solar panels and other alternative energy sources. Based on all these benefits—which is not solely risk-reduction—the Commission found the record showed a "sound basis" for the proposed projects and associated costs such that the

project cost was "justified by the incremental benefits." (Appellants' App. Vol. II, pp. 29-30). The monetization analysis reflects total benefits over a twenty-year period of over $2 billion, compared to the total estimated cost of the Proposed Plan of $1.2 billion. Also monetized in the analysis is the ability of the new modernized grid to self-heal, without the need for human interaction, which accounted for a benefit of $429 million,

[27] While the evidence indicates that "IPL's assets are currently functioning well but operating at various levels of risk (with an ever increasing number of assets migrating into the high risk zone)," the Proposed Plan intends to "counter the continuing trend of more assets moving into the high risk region, which will lead to more frequent equipment failures, thus affecting large numbers of customers." (Exh. Vol. II, p. 140).

[28] In its Order, the Commission found that the Proposed Plan would "reduce risk of asset failure and maintain service reliability," thus "provid[ing] incremental benefits compared to how the future would otherwise unfold." (Appellant's App. Vol. II, p. 30). The Commission specifically pointed to IPL's supplemental analysis of the Proposed Plan's benefits, which "monetized, from the customer experience perspective, the value of avoiding service outages associated with asset failure." (Appellants' App. Vol. II, p. 30). Based on that analysis, the Commission determined that the Proposed Plan "will provide a net benefit that exceeds the cost of the eligible improvements." (Appellants' App. Vol. II, p. 30). The Commission concluded that the estimated cost of the

Proposed Plan rested on a sound factual and analytical foundation and was determined to be reasonable.

[29] Accordingly, as the Proposed Plan's overall goal was "to replace the aging infrastructure by modernizing its transmission and distribution system," IPL identified, besides risk reduction, several other benefits which added to the system's well-being. Based on the monetization of these numerous incremental benefits, IPL supported its burden that "the estimated costs of the eligible improvements . . . are justified by the incremental benefits" gained by the customers. *See* I.C. § 8-1-39-10(b). As we find that the Commission's interpretation of its statute is reasonable, we affirm the Order.

## IV. *Specific Findings*

[30] Lastly, the Consumer Parties contend that the Commission's Order lacks specific findings on all material issues raised by the parties. They maintain that the Order misconstrued the cost-justification requirement by adopting IPL's position and addressing the "material deficiencies in IPL's monetization analysis" without critical scrutiny, despite the Consumer Parties' arguments indicating that the analysis greatly overstated the benefits while understating the costs. (Appellants' Br. p. 51).

[31] "[A]n Order must contain specific findings on all the factual determinations material to its ultimate conclusions." *N. Ind. Pub. Serv. Co*, 907 N.E.2d at 1016. Specific findings are not required on particular arguments by the parties. *Citizens Action Coalition of Ind., Inc. v. Indianapolis Power & Light Co.*, 74 N.E.3d

554, 564-65 (Ind. Ct. App. 2017) (specific findings not required on claims that "one component" of rate order had "deleterious effect on energy conservation and energy efficiency," or that "structure disproportionally harms" some consumers). Findings "need to be only specific enough to permit us to intelligently review the [agency] decision." *J.M. v. Review Bd. of Ind. Dep't of Workforce Dev.*, 975 N.E.2d 1283, 1287 (Ind. 2012). "Agency findings are specific enough when they are given with sufficient particularity and specificity such that the reviewing court can adequately and competently review the agency's decision." *Id.* "An appeal based on an alleged lack of specific findings presents a mixed question of law and fact." *NIPSCO Indus. Grp.*, 125 N.E.3d at 627. "In these situations, we review the Commission's conclusions for reasonableness, deferring to the Commission based on the amount of expertise exercised by [it]." *Id.*

[32] While the TDSIC statute specifies three material determinations the Commission must make on a proposed plan, the Consumer Parties only disputed the third requirement, in which the "estimated costs of the eligible improvements . . . are justified by [the Proposed Plan's] incremental benefits." I.C. § 8-1-39-10(b). In reviewing the Order, the Commission's detailed findings and scrutiny span three pages. "Based on the evidence presented," the Commission found that "the record demonstrates that the estimated cost of IPL's TDSIC Plan . . . rests on a sound factual and analytical foundation and is reasonable," and that IPL's estimate was "the best estimate of the cost of the [Plan's] eligible improvements." (Appellants' App. Vol. II, p. 29). The

Commission's findings on the incremental benefits are equally clear and evidence based: "[a]s shown in Table 3.3 of the [Proposed Plan], IPL monetized" the customer value "of avoiding service outages associated with asset failure." (Appellants' App. Vol. II, p, 30). IPL's analysis—which "did not attempt to quantify all project benefits," but "focused on projects that lend themselves to monetization"—showed the projects "provide a net benefit that exceeds the cost of the eligible improvements." (Appellants' App. Vol. II, p. 30). The Order found that "record evidence demonstrates" that the Proposed Plan seeks "to reduce risk of asset failure and maintain service reliability;" that it "provides incremental benefits compared to how the future would otherwise unfold;" and that IPL has "optimized the incremental benefits" and shown "a sound basis for the proposed projects and associated costs." (Appellants' App. Vol. II, p. 30). Thus, the Order "determin[ed] that the estimated costs of the [Proposed Plan] improvements are justified by incremental benefits attributable to the [Proposed Plan]." (Appellants' App. Vol. II, p. 30).

[33] All these specific findings are prefaced by the Order's detailed summary of evidence on this topic in IPL's case-in-chief, in the Consumer Parties' opposition case, and in IPL's rebuttal. *See NIPSCO Indus. Grp.*, 125 N.E.3d at 625 ("Despite the Industrial Group's arguments to the contrary, the Commission supported its conclusion to approve the TDSIC-2 petition with specific findings," prefaced "by summarizing the conflicting testimony presented to it [] by NIPSCO and the Industrial Group"). Accordingly, the Commission's specific findings are sufficiently particular that we can

"adequately and competently review" the Commission's decision. *J.M.*, 975 N.E.2d at 1287.

[34] We disagree with the Consumer Parties that the Commission should have specifically addressed each one of its concerns posed by IPL's monetization analysis and risk-reduction model. The Commission's findings credited and gave weight to IPL's monetization analysis and risk-reduction model. It accepted IPL's methodology of calculation of benefits and estimated costs. While both the Consumer Parties' and IPL's methodology were evidenced in the record with expert witnesses on both sides, the Commission rejected the Consumer Parties' proposed evaluation and gave no weight to its witnesses Although "reasonable people may disagree" with the Commission's findings, "that is immaterial to our review of the [Commission's] decision, which contains sufficient findings and is supported by substantial evidence." *Citizens Action Coalition of Ind., Inc. v. N. Ind. Publ. Serv. Co*, 76 N.E. 3d 144, 155 (Ind. 2017).

[35] As we noted before, specific findings are not required on particular arguments by parties. *See Citizens Action Coalition of Ind., Inc.*, 74 N.E.3d at 564-65. Here, the Commission's Order contained specific findings on all the factual determinations material to its ultimate conclusions and was prefaced by an extensive review of the evidence presented by the parties. Although the Commission did not explicitly refute each and every argument made by the Consumer Parties, its findings are sufficiently detailed to allow us an intelligent and adequate review of the Order.

# CONCLUSION

Based on the foregoing, we hold that the Commission properly admitted IPL's workpapers by administrative notice; the Commission properly determined that the costs of the eligible improvements included in the Proposed Plan are justified by their incremental benefits; and the Commission's findings are sufficiently specific to enable appellate review of its decision.

Affirmed.

May, J. and Altice, J. concur